# NATIONAL LABOR RELATIONS BOARD *v.* INSURANCE AGENTS' INTERNATIONAL UNION, AFL-CIO.

No. 15.   Argued December 7–8, 1959.—Decided February 23, 1960.

478

*Dominick L. Manoli* argued the cause for petitioner. With him on the brief were *Solicitor General Rankin, Stuart Rothman* and *Thomas J. McDermott.*

*Isaac N. Groner* argued the cause and filed a brief for respondent. He was also on a brief for Insurance Workers International Union, AFL-CIO.

*Nahum A. Bernstein* filed a brief for Prudential Insurance Company of America, as *amicus curiae*, urging reversal. *Donald R. Seawell* was of counsel.

Mr. Justice Brennan delivered the opinion of the Court.

This case presents an important issue of the scope of the National Labor Relations Board's authority under § 8 (b)(3) of the National Labor Relations Act,[1] which

---

[1] As added by the Labor Management Relations Act, 1947 (the Taft-Hartley Act), 61 Stat. 141, 29 U. S. C. § 158 (b)(3).

provides that "it shall be an unfair labor practice for a labor organization or its agents . . . to refuse to bargain collectively with an employer, provided it is the representative of his employees . . . ." The precise question is whether the Board may find that a union, which confers with an employer with the desire of reaching agreement on contract terms, has nevertheless refused to bargain collectively, thus violating that provision, solely and simply because during the negotiations it seeks to put economic pressure on the employer to yield to its bargaining demands by sponsoring on-the-job conduct designed to interfere with the carrying on of the employer's business.

Since 1949 the respondent Insurance Agents' International Union and the Prudential Insurance Company of America have negotiated collective bargaining agreements covering district agents employed by Prudential in 35 States and the District of Columbia. The principal duties of a Prudential district agent are to collect premiums and to solicit new business in an assigned locality known in the trade as his "debit." He has no fixed or regular working hours except that he must report at his district office two mornings a week and remain for two or three hours to deposit his collections, prepare and submit reports, and attend meetings to receive sales and other instructions. He is paid commissions on collections made and on new policies written; his only fixed compensation is a weekly payment of $4.50 intended primarily to cover his expenses.

In January 1956 Prudential and the union began the negotiation of a new contract to replace an agreement expiring in the following March. Bargaining was carried on continuously for six months before the terms of the new contract were agreed upon on July 17, 1956.[2] It is

---

[2] A stenographic record of the discussions at the bargaining table was kept, and the transcription of it fills 72 volumes.

not questioned that, if it stood alone, the record of nego-tiations would establish that the union conferred in good faith for the purpose and with the desire of reaching agreement with Prudential on a contract.

However, in April 1956, Prudential filed a § 8 (b)(3) charge of refusal to bargain collectively against the union. The charge was based upon actions of the union and its members outside the conference room, occurring after the old contract expired in March. The union had announced in February that if agreement on the terms of the new contract was not reached when the old contract expired, the union members would then participate in a "Work Without a Contract" program—which meant that they would engage in certain planned, concerted on-the-job activities designed to harass the company.

A complaint of violation of § 8 (b)(3) issued on the charge and hearings began before the bargaining was concluded.[3] It was developed in the evidence that the union's harassing tactics involved activities by the member agents such as these: refusal for a time to solicit new business, and refusal (after the writing of new business was resumed) to comply with the company's reporting procedures; refusal to participate in the company's "May Policyholders' Month Campaign"; report-ing late at district offices the days the agents were scheduled to attend them, and refusing to perform cus-tomary duties at the offices, instead engaging there in "sit-in-mornings," "doing what comes naturally" and leaving at noon as a group; absenting themselves from special business conferences arranged by the company; picketing and distributing leaflets outside the various offices of the company on specified days and hours as

[3] The hearings on the unfair labor practice charge were recessed in July to allow the parties to concentrate on the effort to negotiate the settlement which was arrived at in the new contract of July 17, 1956.

directed by the union; distributing leaflets each day to policyholders and others and soliciting policyholders' signatures on petitions directed to the company; and presenting the signed policyholders' petitions to the company at its home office while simultaneously engaging in mass demonstrations there.

The hearing examiner filed a report recommending that the complaint be dismissed. The examiner noted that the Board in the so-called *Personal Products* case, *Textile Workers Union,* 108 N. L. R. B. 743, had declared similar union activities to constitute a prohibited refusal to bargain; but since the Board's order in that case was set aside by the Court of Appeals for the District of Columbia Circuit, 97 U. S. App. D. C. 35, 227 F. 2d 409, he did not consider that he was bound to follow it.

However, the Board on review adhered to its ruling in the *Personal Products* case, rejected the trial examiner's recommendation, and entered a cease-and-desist order, 119 N. L. R. B. 768. The Court of Appeals for the District of Columbia Circuit also adhered to its decision in the *Personal Products* case, and, as in that case, set aside the Board's order. 104 U. S. App. D. C. 218, 260 F. 2d 736. We granted the Board's petition for certiorari to review the important question presented. 358 U. S. 944.

The hearing examiner found that there was nothing in the record, apart from the mentioned activities of the union during the negotiations, that could be relied upon to support an inference that the union had not fulfilled its statutory duty; in fact nothing else was relied upon by the Board's General Counsel in prosecuting the complaint.[4] The hearing examiner's analysis of the congres-

---

[4] Examining the matter *de novo* without the *Personal Products* decision of the Board as precedent, the examiner called repeatedly upon the Board's General Counsel for some evidence of failure to bargain in good faith, besides the harassing tactics themselves. When such evidence was not forthcoming, he commented, "It may well be

sional design in enacting the statutory duty to bargain led him to conclude that the Board was not authorized to find that such economically' harassing activities constituted a § 8 (b)(3) violation. The Board's opinion answers flatly "We do not agree" and proceeds to say ". . . the Respondent's reliance upon harassing tactics during the course of negotiations for the avowed purpose of compelling the Company to capitulate to its terms is the antithesis of reasoned discussion it was duty-bound to follow. Indeed, it clearly revealed an unwillingness to submit its demands to the consideration of the bargaining table where argument, persuasion, and the free interchange of views could take place. In such circumstances, the fact that the Respondent continued to confer with the Company and was desirous of concluding an agreement does not *alone* establish that it fulfilled its obligation to bargain in good faith . . . ." 119 N. L. R. B., at 769, 770–771. Thus the Board's view is that irrespective of the union's good faith in conferring with the employer at the bargaining table for the purpose and with the desire of reaching agreement on contract terms, its tactics during the course of the negotiations constituted *per se* a violation of § 8 (b)(3).[5] Accordingly, as is said in the Board's brief,

---

that the Board will be able to 'objectively evaluate' the 'impact' of activities upon 'collective-bargaining negotiations' from the mere 'nature of the activities,' but the Trial Examiner is reluctant even to attempt this feat of mental pole vaulting with only presumtion as a pole." 119 N. L. R. B., at 781–782.

[5] The Board observed that the union's continued participation in negotiations and desire to reach an agreement only indicated that it "was prepared to go through the motions of bargaining while relying upon a campaign of harassing tactics to disrupt the Company's business to achieve acceptance of its contractual demands." 119 N. L. R. B., at 771. The only apparent basis for the conclusion that the union was only going through the "motions" of bargaining is the Board's own postulate that the tactics in question were inconsistent with the statutorily required norm of collective bargaining,

"The issue here . . . comes down to whether the Board is authorized under the Act to hold that such tactics, which the Act does not specifically forbid but Section 7 does not protect,[6] support a finding of a failure to bargain in good faith as required by Section 8 (b)(3)."

*First.* The bill which became the Wagner Act included no provision specifically imposing a duty on either party to bargain collectively. Senator Wagner thought that the bill required bargaining in good faith without such a provision.[7] However, the Senate Committee in charge of the bill concluded that it was desirable to include a provision making it an unfair labor practice for an *employer* to refuse to bargain collectively in order to assure that the Act would achieve its primary objective of requiring an employer to recognize a union selected by his employees as their representative. It was believed that other rights guaranteed by the Act would not be meaningful if the employer was not under obligation to confer with the union in an effort to arrive at the terms of an agreement. It was said in the Senate Report:

"But, after deliberation, the committee has concluded that this fifth unfair labor practice should be inserted in the bill. It seems clear that a guarantee of the right of employees to bargain collectively

and the Board's opinion, and its context, reveal that this was all that it meant. This *per se* rule amounted to the "pole vaulting" that the examiner said he was "reluctant even to attempt." See note 4, *supra.*

[6] We will assume without deciding that the activities in question here were not "protected" under § 7 of the Act. See p. 492 and note 22, *infra.*

[7] See Hearings before the Senate Committee on Education and Labor on S. 1958, 74th Cong., 1st Sess., p. 43: "Therefore, while the bill does not state specifically the duty of an employer to recognize and bargain collectively with the representatives of his employees, because of the difficulty of setting forth this matter precisely in statutory language, such a duty is clearly implicit in the bill."

through representatives of their own choosing is a mere delusion if it is not accompanied by the correlative duty on the part of the other party to recognize such representatives . . . and to negotiate with them in a bona fide effort to arrive at a collective bargaining agreement. Furthermore, the procedure of holding governmentally supervised elections to determine the choice of representatives of employees becomes of little worth if after the election its results are for all practical purposes ignored. Experience has proved that neither obedience to law nor respect for law is encouraged by holding forth a right unaccompanied by fulfillment. Such a course provokes constant strife, not peace." S. Rep. No. 573, 74th Cong., 1st Sess., p. 12.

However, the nature of the duty to bargain in good faith thus imposed upon employers by § 8 (5) of the original Act [8] was not sweepingly conceived. The Chairman of the Senate Committee declared: "When the employees have chosen their organization, when they have selected their representatives, all the bill proposes to do is to escort them to the door of their employer and say, 'Here they are, the legal representatives of your employees.' What happens behind those doors is not inquired into, and the bill does not seek to inquire into it." [9]

The limitation implied by the last sentence has not been in practice maintained—practically, it could hardly have been—but the underlying purpose of the remark has remained the most basic purpose of the statutory provision. That purpose is the making effective of the duty of management to extend recognition to the union; the duty of management to bargain in good faith is essentially

---

[8] 49 Stat. 453. The corresponding provision in the current form of the Act is § 8 (a) (5), 61 Stat. 141, 29 U. S. C. § 158 (a) (5).

[9] Senator Walsh, at 79 Cong. Rec. 7660.

a corollary of its duty to recognize the union. Decisions under this provision reflect this. For example, an employer's unilateral wage increase during the bargaining processes tends to subvert the union's position as the representative of the employees in matters of this nature, and hence has been condemned as a practice violative of this statutory provision. See *Labor Board* v. *Crompton-Highland Mills, Inc.*, 337 U. S. 217. And as suggested, the requirement of collective bargaining, although so premised, necessarily led beyond the door of, and into, the conference room. The first annual report of the Board declared: "Collective bargaining is something more than the mere meeting of an employer with the representatives of his employees; the essential thing is rather the serious intent to adjust differences and to reach an acceptable common ground. . . . The Board has repeatedly asserted that good faith on the part of the employer is an essential ingredient of collective bargaining." [10] This standard had early judicial approval, *e. g.*, *Labor Board* v. *Griswold Mfg. Co.*, 106 F. 2d 713. Collective bargaining, then, is not simply an occasion for purely formal meetings between management and labor, while each maintains an attitude of "take it or leave it"; it presupposes a desire to reach ultimate agreement, to enter into a collective bargaining contract. See *Heinz Co.* v. *Labor Board*, 311 U. S. 514. This was the sort of recognition that Congress, in the Wagner Act, wanted extended to labor unions; recognition as the bargaining agent of the employees in a process that looked to the ordering of the parties' industrial relationship through the formation of a contract. See *Teamsters Union* v. *Oliver*, 358 U. S. 283, 295.

But at the same time, Congress was generally not concerned with the substantive terms on which the parties

---

[10] 1 N. L. R. B. Ann. Rep., pp. 85–86.

contracted. Cf. *Terminal Railroad Assn.* v. *Brotherhood of Railroad Trainmen,* 318 U. S. 1, 6. Obviously there is tension between the principle that the parties need not contract on any specific terms and a practical enforcement of the principle that they are bound to deal with each other in a serious attempt to resolve differences and reach a common ground. And in fact criticism of the Board's application of the "good-faith" test arose from the belief that it was forcing employers to yield to union demands if they were to avoid a successful charge of unfair labor practice.[11] Thus, in 1947 in Congress the fear was expressed that the Board had "gone very far, in the guise of determining whether or not employers had bargained in good faith, in setting itself up as the judge of what concessions an employer must make and of the proposals and counterproposals that he may or may not make." H. R. Rep. No. 245, 80th Cong., 1st Sess., p. 19. Since the Board was not viewed by Congress as an agency which should exercise its powers to arbitrate the parties' substantive solutions of the issues in their bargaining, a check on this apprehended trend was provided by writing the good-faith test of bargaining into § 8 (d) of the Act. That section defines collective bargaining as follows:

> "For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but

---

[11] This Court related the history in *Labor Board* v. *American National Ins. Co.,* 343 U. S. 395, 404.

such obligation does not compel either party to agree to a proposal or require the making of. a concession . . . ." [12]

The same problems as to whether positions taken at the bargaining table. violate the good-faith test continue to arise under the Act as amended. See *Labor Board* v. *Truitt Mfg. Co.*, 351 U. S. 149; *Labor Board* v. *Borg-Warner Corp.*, 356 U. S. 342, 349. But it remains clear that § 8 (d) was an attempt by Congress to prevent the Board from controlling the settling of the terms of collective bargaining agreements. *Labor Board* v. *American National Ins. Co.*, 343 U. S. 395, 404.

*Second.* At the same time as it was statutorily defining the duty to bargain collectively, Congress, by adding § 8 (b) (3.) of the Act through the Taft-Hartley amendments, imposed that duty on labor organizations. Unions obviously are formed for the very purpose of bargaining collectively; but the legislative history makes it plain that Congress was wary of. the position of some unions, and wanted to ensure that they would approach the bargaining table with the same attitude of willingness to reach an agreement as had been enjoined on management earlier. It intended to prevent employee representatives from putting forth the same "take it or leave it" attitude that had been condemned in management. 93 Cong. Rec. 4135, 4363; 5005. [13]

---

[12] 61 Stat. 142, 29 U. S. C. § 158 (d).

[13] Senator Ellender was most explicit on the matter at 93 Cong. Rec. 4135.

The legislative history seems also to have contemplated that the provision would be applicable to a union which declined to identify its bargaining demands while attempting financially to exhaust the employer. See the remark by Senator Hatch at 93 Cong. Rec. 5005. Cf. note 15, *infra*. A closely related application is developed in *American Newspaper Publishers Assn.* v. *Labor Board*, 193 F. 2d 782, 804–805, affirmed. as to other issues on limited grant of certiorari, 345 U. S. 100.

*Third.* It is apparent from the legislative history of the whole Act that the policy of Congress is to impose a mutual duty upon the parties to confer in good faith with a desire, to reach agreement, in the belief that such an approach from both sides of the table promotes the overall design of achieving industrial peace. See *Labor Board* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 45. Discussion conducted under that standard of good faith may narrow the issues, making the real demands of the parties clearer to each other, and perhaps to themselves, and may encourage an attitude of settlement through give and take. The mainstream of cases before the Board and in the courts reviewing its orders, under the provisions fixing the duty to bargain collectively, is concerned with insuring that the parties approach the bargaining table with this attitude. But apart from this essential standard of conduct, Congress intended that the parties should have wide latitude in their negotiations, unrestricted by any governmental power to regulate the substantive solution of their differences. See *Teamsters Union* v. *Oliver, supra,* at 295.

We believe that the Board's approach in this case—unless it can be defended, in terms of § 8 (b)(3), as resting on some unique character of the union tactics involved here—must be taken as proceeding from an erroneous view of collective bargaining. It must be realized that collective bargaining, under a system where the Government does not attempt to control the results of negotiations, cannot be equated with an academic collective search for truth—or even with what might be thought to be the ideal of one. The parties—even granting the modification of views that may come from a realization of economic interdependence—still proceed from contrary and to an extent antagonistic viewpoints and concepts of self-interest. The system has not reached the ideal of the philosophic notion that perfect understanding among

people would lead to perfect agreement among them on values. The presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized. Abstract logical analysis might find inconsistency between the command of the statute to negotiate toward an agreement in good faith and the legitimacy of the use of economic weapons, frequently having the most serious effect upon individual workers and productive enterprises, to induce one party to come to the terms desired by the other. But the truth of the matter is that at the present statutory stage of our national labor relations policy, the two factors—necessity for good-faith bargaining between parties, and the availability of economic pressure devices to each to make the other party incline to agree on one's terms—exist side by side. One writer recognizes this by describing economic force as "a prime motive power for agreements in free collective bargaining." [14] Doubtless one factor influences the other; there may be less need to apply economic pressure if the areas of controversy have been defined through discussion; and at the same time, negotiation positions are apt to be weak or strong in accordance with the degree of economic power the parties possess. A close student of our national labor relations laws writes: "Collective bargaining is curiously ambivalent even today. In one aspect collective bargaining is a brute contest of economic power somewhat masked by polite manners and voluminous statistics. As the relation matures, Lilliputian bonds control the opposing concentrations of economic power; they lack legal sanctions but are nonetheless effective to contain the use of power. Initially it may be only fear of the economic consequences of disagreement that turns the parties to facts, reason,

---

[14] G. W. Taylor, Government Regulation of Industrial Relations, p. 18.

a sense of responsibility, a responsiveness to government and public opinion, and moral principle; but in time these forces generate their own compulsions, and negotiating a contract approaches the ideal of informed persuasion." Cox, The Duty to Bargain in Good Faith, 71 Harv. L. Rev. 1401, 1409.

For similar reasons, we think the Board's approach involves an intrusion into the substantive aspects of the bargaining process—again, unless there is some specific warrant for its condemnation of the precise tactics involved here. The scope of § 8 (b)(3) and the limitations on Board power which were the design of § 8 (d) are exceeded, we hold, by inferring a lack of good faith not from any deficiencies of the union's performance at the bargaining table by reason of its attempted use of economic pressure, but solely and simply because tactics designed to exert economic pressure were employed during the course of the good-faith negotiations. Thus the Board in the guise of determining good or bad faith in negotiations could regulate what economic weapons a party might summon to its aid. And if the Board could regulate the choice of economic weapons that may be used as part of collective bargaining, it would be in a position to exercise considerable influence upon the substantive terms on which the parties contract. As the parties' own devices became more limited, the Government might have to enter even more directly into the negotiation of collective agreements. Our labor policy is not presently erected on a foundation of government control of the results of negotiations. See S. Rep. No. 105, 80th Cong., 1st Sess., p. 2. Nor does it contain a charter for the National Labor Relations Board to act at large in equalizing disparities of bargaining power between employer and union.

*Fourth.* The use of economic pressure, as we have indicated, is of itself not at all inconsistent with the duty of

bargaining in good faith. But in three cases in recent years, the Board has assumed the power to label particular union economic weapons inconsistent with that duty. See the *Personal Products* case,[15] *supra,* 108 N. L. R. B. 743, set aside, 97 U. S. App. D. C. 35, 227 F. 2d 409;[16] the *Boone County* case, *United Mine Workers,* 117 N. L. R. B. 1095, set aside, 103 U. S. App. D. C. 207, 257 F. 2d 211;[17] and the present case. The Board freely (and we think correctly) conceded here that a "total" strike called by the union would not have subjected it to sanctions under § 8 (b)(3), at least if it were called after the old contract, with its no-strike clause, had expired. Cf. *United Mine Workers, supra.* The Board's opinion in the instant case is not so unequivocal as this

---

[15] The facts in *Personal Products* did, in the Board's view, present the case of a union which was using economic pressure against an employer in a bargaining situation without identifying what its bargaining demands were—a matter which can be viewed quite differently in terms of a § 8 (b)(3) violation from the present case. See note 13, *supra.* The Board's decision in *Personal Products* may have turned on this to some extent, see 108 N. L. R. B., at 746; but its decision in the instant case seems to view *Personal Products* as turning on the same point as does the present case.

[16] This Court granted certiorari, 350 U. S. 1004, on the Board's petition, to review that judgment; but in the light of intervening circumstances which at least indicated that the litigation had become less meaningful to the parties, cf. *The Monrosa* v. *Carbon Black Export, Inc.,* 359 U. S. 180, the order granting certiorari was vacated and certiorari was denied. 352 U. S. 864.

[17] The court there displayed a want of sympathy to the Board's theory that a strike in breach of contract violated § 8 (b)(3), see 103 U. S. App. D. C., at 210–211, 257 F. 2d, at 214–215. Cf. Feinsinger, The National Labor Relations Act and Collective Bargaining, 57 Mich. L. Rev. 806–807. However, the court turned its decision on its ruling, *contra* the Board, that there was no breach of the contract involved. On this point, *contra* is *United Mine Workers* v *Benedict Coal Corp.,* 259 F. 2d 346, 351, affirmed this day by an equally divided Court, *ante,* p. 459.

concession (and therefore perhaps more logical).[18]   But in the light of it and the principles we have enunciated, we must evaluate the claim of the Board to power, under § 8 (b)(3), to distinguish among various economic pressure tactics and brand the ones at bar inconsistent with good-faith collective bargaining.   We conclude its claim is without foundation.[19]

(a) The Board contends that the distinction between a total strike and the conduct at bar is that a total strike is a concerted activity protected against employer interference by §§ 7[20] and 8 (a)(1)[21] of the Act, while the activity at bar is not a protected concerted activity.   We may agree *arguendo* with the Board[22] that this Court's decision in the *Briggs-Stratton* case, *Automobile Workers* v. *Wisconsin Board,* 336 U. S. 245, establishes that

---

[18] Said the Board: "Consequently, whether or not an inference of bad faith is permissible where a union engages in a protected strike to enforce its demands, there is nothing unreasonable in drawing such an inference where, as here, the union's conduct is not sanctioned by the Act."   119 N. L. R. B., at 771–772.

[19] Our holding on this ground makes it unnecessary for us to pass on the other grounds for affirmance of the Court of Appeals' judgment urged by respondent.   These we take to include the argument that the Board's order violated the standards of § 8 (c) of the Act, 61 Stat. 142, 29 U. S. C. § 158 (c), and the points touched upon in notes 22 and 23, *infra.*

[20] "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."   49 Stat. 452, as amended, 61 Stat. 140, 29 U. S. C. § 157.

[21] "It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 . . . ."   49 Stat. 452, as amended, 61 Stat. 140, 29 U. S. C. § 158 (a)(1).

[22] Respondent cites a number of specific circumstances in the activities here that might distinguish them from the *Briggs-Stratton* case as to protection under § 7.   We do not pass on the matter.

the employee conduct here was not a protected concerted activity.[23]  On this assumption the employer could have discharged or taken other appropriate disciplinary action against the employees participating in these "slow-down,"

---

[23] *Briggs-Stratton* held, among other things, that employee conduct quite similar to the conduct at bar was neither protected by § 7 of the Act nor prohibited (made an unfair labor practice) by § 8.  The respondent urges that the holding there that the conduct was not prohibited by § 8 in and of itself requires an affirmance of the judgment here, since in this case the Board's order found a violation of § 8.  In fact the Board's General Counsel on oral argument made the concession that *Briggs-Stratton* would have to be overruled for the Board to prevail here.

But regardless of the status today of the other substantive rulings in the *Briggs-Stratton* case, we cannot say that the case's holding as to § 8 requires a judgment for the respondent here.  *Briggs-Stratton* was a direct review on certiorari here of a state board order, as modified and affirmed in the State Supreme Court, against the union conduct in question.  The order was assailed by the union here primarily as being beyond the competence of the State to make, by reason of the federal labor relations statutes.  This Court held that the activities in question were neither protected by § 7 nor prohibited by § 8, and allowed the state order to stand.  The primary focus of attention was whether the activities were protected by § 7; there seems to have been no serious contention made that they were prohibited by § 8.  The case arose long before the line of cases beginning with *Personal Products* in which the Board began to relate such activities to § 8 (b)(3).  But of special significance is the fact that the approach to pre-emption taken in *Briggs-Stratton* was that the state courts and this Court on review were required to decide whether the activities were either protected by § 7 or prohibited by § 8.  This approach is "no longer of general application," *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, 245, n. 4, as this Court has since developed the doctrine in pre-emption cases that questions of interpretation of the National Labor Relations Act are generally committed in the first instance to the Board's administrative processes, *San Diego Building Trades Council* v. *Garmon, supra;* except in the atypical situation where those processes are not relevant to an answer to the question.  See *Teamsters Union* v. *Oliver, supra.*  Therefore to view *Briggs-Stratton* as controlling on the § 8 issue here would be to compound the defects of a now discarded approach to pre-emption; it would amount to

"sit-in," and arguably unprotected disloyal tactics. See *Labor Board* v. *Fansteel Metallurgical Corp.*, 306 U. S. 240; *Labor Board* v. *Electrical Workers*, 346 U. S. 464. But surely that a union activity is not protected against disciplinary action does not mean that it constitutes a refusal to bargain in good faith. The reason why the ordinary economic strike is not evidence of a failure to bargain in good faith is not that it constitutes a protected activity but that, as we have developed, there is simply no inconsistency between the application of

saying that the Board would be foreclosed in its adjudicative development of interpretation of the Act by a decision rendered long ago, not arising in review of one of its own orders, at a time when its own views had not come to what they now are, and in which the precise issue (as to § 8 (b)'(3)) was not litigated at all, and the general § 8 issue not litigated seriously. Hence we construe § 8 here uninfluenced by what was said in *Briggs-Stratton*.

However, we will not here re-examine what was said in *Briggs-Stratton* as to §§ 13 and 501. The union here contends that the definition of "strike" in § 501 (2) of the Taft-Hartley Act, 61 Stat. 161, 29 U. S. C. § 142 (2), which is broad enough to include the activities here in question, must be applied here under § 13 of the NLRA, which provides that "Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right." 49 Stat. 457, as amended, 61 Stat. 151, 29 U. S. C. § 163. And if it is so applied, the union argues that § 13 would prevent the Board from considering the conduct in question as an unfair labor practice. The issue was tendered in much the same light in *Briggs-Stratton*, and the Court quite plainly indicated that the definition in § 501 (2) was only to be considered in connection with § 8 (b) (4) and not with § 13, see 336 U. S., at 258–263, especially the last page; at the very least this was a holding alternative to a holding, 336 U. S., at 263–264, that, however defined, § 13, unlike § 7, was not an inhibition on state power. Perhaps this element of the *Briggs-Stratton* decision has become open also, but certainly this is not so clear as is the fact that the § 8 point is open. In any event, we shall not consider the matter further since our affirmance of the Court of Appeals' reversal of the Board's order is, we believe, more properly bottomed on a construction of § 8 (b) (3).

economic pressure and good-faith collective bargaining. The Board suggests that since (on the assumption we make) the union members' activities here were unprotected, and they could have been discharged, the activities should also be deemed unfair labor practices, since thus the remedy of a cease-and-desist order, milder than mass discharges of personnel and less disruptive of commerce, would be available. The argument is not persuasive. There is little logic in assuming that because Congress was willing to allow employers to use self-help against union tactics, if they were willing to face the economic consequences of its use, it also impliedly declared these tactics unlawful as a matter of federal law. Our problem remains that of construing § 8 (b)(3)'s terms, and we do not see how the availability of self-help to the employer has anything to do with the matter.

(b) The Board contends that because an orthodox "total" strike is "traditional" its use must be taken as being consistent with § 8 (b)(3); but since the tactics here are not "traditional" or "normal," they need not be so viewed.[24] Further, the Board cites what it conceives to be the public's moral condemnation of the sort of employee tactics involved here. But again we cannot see how these distinctions can be made under a statute which simply enjoins a duty to bargain in good faith. Again, these are relevant arguments when the question is the scope of the concerted activities given affirmative protection by the Act. But as we have developed, the use of economic pressure by the parties to a labor dispute is not a grudging exception to some policy of completely academic discussion enjoined by the Act; it is part and parcel of the process of collective bargaining. On this basis, we

---

[24] The Board quotes, in support of this, general language from a decision of this Court, *Order of Railroad Telegraphers* v. *Railway Express Agency, Inc.*, 321 U. S. 342, 346, dealing with a wholly different matter—the scope of subjects appropriate for collective bargaining.

fail to see the relevance of whether the practice in question is time-honored or whether its exercise is generally supported by public opinion. It may be that the tactics used here deserve condemnation, but this would not justify attempting to pour that condemnation into a vessel not designed to hold it.[25] The same may be said for the Board's contention that these activities, as opposed to a "normal" strike, are inconsistent with § 8 (b)(3) because they offer maximum pressure on the employer at minimum economic cost to the union. One may doubt whether this was so here,[26] but the matter does not turn on that. Surely it cannot be said that the only economic weapons consistent with good-faith bargaining are those which minimize the pressure on the other party or maximize the disadvantage to the party using them. The catalog of union and employer [27] weapons that might thus fall under ban would be most extensive.[28]

[25] "To say 'there ought to be a law against it' does not demonstrate the propriety of the NLRB's imposing the prohibition." Cox, The Duty to Bargain in Good Faith, 71 Harv. L. Rev. 1401, 1437.

[26] Though it is much urged in the Board's brief here as a general proposition, the Board's opinion (following its *per se* approach) contains no discussion of this point at all insofar as the facts of the case were concerned; it did not discuss the economic effect of the activities on the agents themselves and expressly declined to pass on their effect on the employer. 119 N. L. R. B., at 771. Respondent here urges that the evidence establishes quite the opposite conclusion.

[27] "If relative power be the proper test, surely one who believed the unions to be weak would come to the opposite conclusion. Is it an abuse of 'bargaining *powers*' to threaten a strike at a department store two weeks before Easter instead of engaging in further discussion, postponing the strike until after Easter when the employer will feel it less severely? Is it unfair for an employer to stall negotiations through a busy season or while he is building up inventory so that he can stand a strike better than the workers?" Cox, The Duty to Bargain in Good Faith, 71 Harv. L. Rev. 1401, 1440–1441.

[28] There is a suggestion in the Board's opinion that it regarded the union tactics as a unilateral setting of the terms and conditions of

*Fifth.* These distinctions essayed by the Board here, and the lack of relationship to the statutory standard inherent in them, confirm us in our conclusion that the judgment of the Court of Appeals, setting aside the order of the Board, must be affirmed. For they make clear to us that when the Board moves in this area, with only § 8 (b)(3) for support, it is functioning as an arbiter of the sort of economic weapons the parties can use in seeking to gain acceptance of their bargaining demands. It has sought to introduce some standard of properly "balanced" [29] bargaining power, or some new distinction of justifiable and unjustifiable, proper and "abusive" [30] economic weapons into the collective bargaining duty imposed by the Act. The Board's assertion of power under § 8 (b)(3) allows it to sit in judgment upon every

employment and hence also on this basis violative of § 8 (b)(3), just as an employer's unilateral setting of employment terms during collective bargaining may amount to a breach of its duty to bargain collectively. *Labor Board v. Crompton-Highland Mills, Inc.*, 337 U. S. 217. See 119 N. L. R. B., at 772. Prudential, as *amicus curiae* here, renews this point though the Board does not make it here. It seems baseless to us. There was no indication that the practices that the union was engaging in were designed to be permanent conditions of work. They were rather means to another end. The question whether union conduct could be treated, analogously to employer conduct, as unilaterally establishing working conditions, in a manner violative of the duty to bargain collectively, might be raised for example by the case of a union, anxious to secure a reduction of the working day from eight to seven hours, which instructed its members, during the negotiation process, to quit work an hour early daily. Cf. Note, 71 Harv. L. Rev. 502, 509. But this situation is not presented here, and we leave the question open.

[29] The Board's opinion interprets the National Labor Relations Act to require, in this particular, "a background of balanced bargaining relations." 119 N. L. R. B., at 772.

[30] The Board in *Personal Products* condemned the union's tactics as an "abuse of the Union's bargaining powers." 108 N. L. R. B., at 746.

498

economic weapon the parties to a labor contract negotiation employ, judging it on the very general standard of that section, not drafted with reference to specific forms of economic pressure. We have expressed our belief that this amounts to the Board's entrance into the substantive aspects of the bargaining process to an extent Congress has not countenanced.

It is one thing to say that the Board has been afforded flexibility to determine, for example, whether an employer's disciplinary action taken against specific workers is permissible or not, or whether a party's conduct at the bargaining table evidences a real desire to come into agreement. The statute in such areas clearly poses the problem to the Board for its solution. Cf. *Labor Board* v. *Truck Drivers Union*, 353 U. S. 87. And specifically we do not mean to question in any way the Board's powers to determine the latter question, drawing inferences from the conduct of the parties as a whole. It is quite another matter, however, to say that the Board has been afforded flexibility in picking and choosing which economic devices of labor and management shall be branded as unlawful. Congress has been rather specific when it has come to outlaw particular economic weapons on the part of unions. See § 8 (b)(4) of the National Labor Relations Act, as added by the Taft-Hartley Act, 61 Stat. 141, and as supplemented by the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 542; (29 U. S. C. § 158 (b)(4)); § 8 (b)(7), as added by the latter Act, 73 Stat. 544. But the activities here involved have never been specifically outlawed by Congress.[31] To

---

[31] It might be noted that the House bill, when the Taft-Hartley Act was in the legislative process, contained a list of "unlawful concerted activities" one of which would quite likely have reached some of the union conduct here, but the provision never became law. H. R. 3020, 80th Cong., 1st Sess., § 12.

be sure, the express prohibitions of the Act are not exclusive—if there were any questions of a stratagem or device to evade the policies of the Act, the Board hardly would be powerless. *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 194. But it is clear to us that the Board needs a more specific charter than § 8 (b)(3) before it can add to the Act's prohibitions here.

We recognize without hesitation the primary function and responsibility of the Board to resolve the conflicting interests that Congress has recognized in its labor legislation. Clearly, where the "ultimate problem is the balancing of the conflicting legitimate interests" it must be remembered that "The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." *Labor Board* v. *Truck Drivers Union, supra,* at 96. Certainly a "statute expressive of such large public policy as that on which the National Labor Relations Board is based must be broadly phrased and necessarily carries with it the task of administrative application." *Phelps Dodge Corp.* v. *Labor Board, supra,* at 194. But recognition of the appropriate sphere of the administrative power here obviously cannot exclude all judicial review of the Board's actions. On the facts of this case we need not attempt a detailed delineation of the respective functions of court and agency in this area. We think the Board's resolution of the issues here amounted not to a resolution of interests which the Act had left to it for case-by-case adjudication, but to a movement into a new area of regulation which Congress had not committed to it. Where Congress has in the statute given the Board a question to answer, the courts will give respect to that answer; but they must be sure the question has been asked. We see no indication here that Con-

gress has put it to the Board to define through its processes what economic sanctions might be permitted negotiating parties in an "ideal" or "balanced" state of collective bargaining.

It is suggested here that the time has come for a re-evaluation of the basic content of collective bargaining as contemplated by the federal legislation. But that is for Congress. Congress has demonstrated its capacity to adjust the Nation's labor legislation to what, in its legislative judgment, constitutes the statutory pattern appropriate to the developing state of labor relations in the country. Major revisions of the basic statute were enacted in 1947 and 1959. To be sure, then, Congress might be of opinion that greater stress should be put on the role of "pure" negotiation in settling labor disputes, to the extent of eliminating more and more economic weapons from the parties' grasp, and perhaps it might start with the ones involved here; or in consideration of the alternatives, it might shrink from such an undertaking. But Congress' policy has not yet moved to this point, and with only § 8 (b)(3) to lean on, we do not see how the Board can do so on its own.[32]

*Affirmed.*

---

[32] After we granted certiorari, we postponed to the consideration of the case on the merits a motion by the Board to join as a party here Insurance Workers International Union, AFL–CIO, the style of a new union formed by merger of respondent and another union after the decision of this case in the Court of Appeals, and a contingent motion by respondent that it be deleted as a party. 361 U. S. 872. In the light of our ruling on the merits, there is little point in determining here and now what the legal status of the predecessor and successor union is, and if the issue ever becomes important, we think that the matter is best decided then. For what it is worth, we shall treat both as parties before us in this proceeding. The Board's motion is granted and respondent's is denied. See *Labor Board* v. *Lion Oil Co.*, 352 U. S. 282.

Separate opinion of MR. JUSTICE FRANKFURTER, which MR. JUSTICE HARLAN and MR. JUSTICE WHITTAKER join.

The sweep of the Court's opinion, with its far-reaching implications in a domain of lawmaking of such nation-wide importance as that of legal control of collective bargaining, compels a separate statement of my views.

The conduct which underlies this action was the respondent union's "Work Without a Contract" program which it admittedly initiated after the expiration of its contract with the Prudential Insurance Company on March 19, 1956. In brief, the union directed its members at various times to arrive late to work; to decline, by "sitting-in" the company offices, to work according to their regular schedule; to refuse to write new business or, when writing it, not to report it in the ordinary fashion; to decline to attend special business meetings; to demonstrate before company offices; and to solicit petitions in the union's behalf from policyholders with whom they dealt. Prudential was given notice in advance of the details of this program and of the demands which the union sought to achieve by carrying it out.

This action was commenced by a complaint issued on June 5, 1956, alleging respondent's failure to bargain in good faith. After a hearing, the Trial Examiner recommended that the complaint be dismissed, finding that "[f]rom the 'circumstantial evidence' [of the union's state of mind] of the bargaining itself . . . but one inference is possible . . . the Union's motive was one of good faith . . ."; and that "whatever inference may be as reasonably drawn from the Union's concurrent 'unprotected' activities" is not sufficient to outweigh this evidence of good faith.

The Board sustained exceptions to the Trial Examiner's report, concluding that respondent failed to bargain in good faith. The only facts relied on by the Board were based on the "Work Without a Contract" program. The

Board found that such tactics on respondent's part "clearly revealed an unwillingness to submit its demands to the consideration of the bargaining table" and that respondent therefore failed to bargain in good faith. In support of its conclusion of want of bargaining in good faith, the Board stated that "[h]arassing activities are plainly 'irreconcilable with the Act's requirement of reasoned discussion in a background of balanced bargaining relations upon which good-faith bargaining must rest' . . . ." The Board made no finding that the outward course of the negotiations gave rise to an inference that respondent's state of mind was one of unwillingness to reach agreement. It found from the character of respondent's activities in carrying out the "Work Without a Contract" program that what appeared to be good faith bargaining at the bargaining table was in fact a sham:

> "[T]he fact that the Respondent continued to confer with the Company and was desirous of concluding an agreement does not *alone* establish that it fulfilled its obligation to bargain in good faith, as the Respondent argues and the Trial Examiner believes. At most, it demonstrates that the Respondent was prepared to go through the motions of bargaining while relying upon a campaign of harassing tactics to disrupt the Company's business to achieve acceptance of its contractual demands."

The Board issued a cease-and-desist order [1] and sought its enforcement in the Court of Appeals for the District of Columbia. Respondent cross-petitioned to set it aside.

---

[1] The order in part provided: "[T]he Respondent . . . shall: 1. Cease and desist from refusing to bargain collectively in good faith with The Prudential Insurance Company of America . . . by authorizing, directing, supporting, inducing or encouraging the Company's employees to engage in slowdowns, harassing activities or

The Court of Appeals, relying exclusively on its prior decision in *Textile Workers Union* v. *Labor Board,* 97 U. S. App. D. C. 35, 227 F. 2d 409 (1955), denied enforcement and set aside the order. In the *Textile Workers* case the court had held (one judge dissenting) that the Board could not consider the "harassing" activities of the union there involved as evidence of lack of good faith during the negotiations. "There is not the slightest inconsistency between genuine desire to come to an agreement and use of economic pressure to get the kind of agreement one wants." 97 U. S. App. D. C. 35, 36, 227 F. 2d 409, 410.

The record presents two different grounds for the Board's action in this case. The Board's own opinion proceeds in terms of an examination of respondent's conduct as it bears upon the genuineness of its bargaining in the negotiation proceedings. From the respondent's conduct the Board drew the inference that respondent's state of mind was inimical to reaching an agreement, and that inference alone supported its conclusion of a refusal to bargain. The Board's position in this Court proceeded in terms of the relation of conduct such as respondent's to the kind of bargaining required by the statute, without regard to the bearing of such conduct on the proof of good faith revealed by the actual bargaining. The Board maintained that it

"could appropriately determine that the basic statutory purpose of promoting industrial peace through the collective bargaining process would be defeated by sanctioning resort to this form of industrial warfare as a collective bargaining technique."

other unprotected conduct, in the course of their employment and in disregard of their duties and customary routines, for the purpose of forcing the Company to accept its bargaining demands, or from engaging in any like or related conduct in derogation of its statutory duty to bargain . . . ."

The opinion of this Court, like that of the Court of Appeals, disposes of both questions by a single broad stroke. It concludes that conduct designed to exert pressure on the bargaining situation with the aim of achieving favorable results is to be deemed entirely consistent with the duty to bargain in good faith. No evidentiary significance, not even an inference of a lack of good faith, is allowed to be drawn from the conduct in question as part of a total context.

I agree that the position taken by the Board here is not tenable. In enforcing the duty to bargain the Board must find the ultimate fact whether, in the case before it and in the context of all its circumstances, the respondent has engaged in bargaining without the sincere desire to reach agreement which the Act commands. I further agree that the Board's action in this case is not sustainable as resting upon a determination that respondent's apparent bargaining was in fact a sham, because the evidence is insufficient to justify that conclusion even giving the Board, as we must, every benefit of its right to draw on its experience in interpreting the industrial significance of the facts of a record. See *Universal Camera Corp.* v. *Labor Board,* 340 U. S. 474. What the Board has in fact done is lay down a rule of law that such conduct as was involved in carrying out the "Work Without a Contract" program necessarily betokens bad faith in the negotiations.

The Court's opinion rests its conclusion on the generalization that "the ordinary economic strike is not evidence of a failure to bargain in good faith . . . because . . . there is simply no inconsistency between the application of economic pressure and good-faith collective bargaining." This large statement is justified solely by reference to § 8 (b)(3) and to the proposition that inherent in bargaining is room for the play of forces which reveal the strength of one party, or the weakness of

the other, in the economic context in which they seek agreement. But in determining the state of mind of a party to collective bargaining negotiations the Board does not deal in terms of abstract "economic pressure." It must proceed in terms of specific conduct which it weighs as a more or less reliable manifestation of the state of mind with which bargaining is conducted. No conduct in the complex context of bargaining for a labor agreement can profitably be reduced to such an abstraction as "economic pressure." An exertion of "economic pressure" may at the same time be part of a concerted effort to evade or disrupt a normal course of negotiations. Vital differences in conduct, varying in character and effect from mild persuasion to destructive, albeit "economic," violence [2] are obscured under cover of a single abstract phrase.

While § 8 (b)(3) of course contemplates some play of "economic pressure," it does not follow that the purpose in engaging in tactics designed to exert it is to reach agreement through the bargaining process in the manner which the statute commands, so that the Board is precluded from considering such conduct, in the totality of circumstances, as evidence of the actual state of mind of the actor. Surely to deny this scope for allowable judgment to the Board is to deny it the special function with which it has been entrusted. See *Universal Camera Corp.* v. *Labor Board, supra.* This Court has in the past declined to pre-empt by broad proscriptions the Board's competence in the first instance to weigh the significance of the raw facts of conduct and to draw from them an informed judgment as to the ultimate fact. It has recognized that the significance of conduct, itself apparently innocent and evidently insufficient to sustain a finding of

[2] "There are plenty of methods of coercion short of actual physical violence." Senator Taft, at 93 Cong. Rec. 4024.

an unfair labor practice, "may be altered by imponderable subtleties at work, which it is not our function to appraise" but which are, first, for the Board's consideration upon all the evidence. *Labor Board* v. *Virginia Power Co.*, 314 U. S. 469, 479. Activities in isolation may be wholly innocent, lawful and "protected" by the Act, but that ought not to bar the Board from finding, if the record justifies it, that the isolated parts "are bound together as the parts of a single plan [to frustrate agreement]. The plan may make the parts unlawful." *Swift & Co.* v. *United States,* 196 U. S. 375, 396. See also *Aikens* v. *Wisconsin,* 195 U. S. 194, 206.

Moreover, conduct designed to exert and exerting "economic pressure" may not have the shelter of § 8 (b)(3) even in isolation. Unlawful violence, whether to person or livelihood, to secure acceptance of an offer, is as much a withdrawal of included statutory subjects from bargaining as the "take it or leave it" attitude which the statute clearly condemns.[3] One need not romanticize the community of interest between employers and employees, or be unmindful of the conflict between them, to recognize that utilization of what in one set of circumstances may only signify resort to the traditional weapons of labor may in another and relevant context offend the attitude toward bargaining commanded by the statute. Section 8 (b)(3) is not a specific direction, but an expression of a governing viewpoint or policy to which, by the process of specific application, the Board and the courts must give concrete, not doctrinaire content.

The main purpose of the Wagner Act was to put the force of law behind the promotion of unionism as the legitimate and necessary instrument "to give laborers opportunity to deal on equality with their employer."

---

[3] As the Court states, the prevention of union conduct designed to enforce such an attitude was a primary purpose of the enactment of § 8 (b)(3). See, *e. g.,* 93 Cong. Rec. 4135.

Mr. Chief Justice Taft for the Court, in *American Steel Foundries* v. *Tri-City Central Trades Council*, 257 U. S. 184, 209. Equality of bargaining power between capital and labor, to use the conventional terminology of our predominant economic system, was the aim of this legislation. The presupposition of collective bargaining was the progressive enlargement of the area of reason in the process of bargaining through the give-and-take of discussion and enforcing machinery within industry, in order to substitute, in the language of Mr. Justice Brandeis, "processes of justice for the more primitive method of trial by combat." *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443, 488 (dissenting). Promotion of unionism by the Wagner Act, with the resulting progress of rational collective bargaining, has been gathering momentum for a quarter of a century. In view of the economic and political strength which has thereby come to unions, interpretations of the Act ought not to proceed on the assumption that it actively throws its weight on the side of unionism in order to redress an assumed inequality of bargaining power. For the Court to fashion the rules governing collective bargaining on the assumption that the power and position of labor unions and their solidarity are what they were twenty-five years ago, is to fashion law on the basis of unreality. Accretion of power may carry with it increasing responsibility for the manner of its exercise.

Therefore, in the unfolding of law in this field it should not be the inexorable premise that the process of collective bargaining is by its nature a bellicose process. The broadly phrased terms of the Taft-Hartley Act should be applied to carry out the broadly conceived policies of the Act. At the core of the promotion of collective bargaining, which was the chief means by which the great social purposes of the National Labor Relations Act were sought to be furthered, is a purpose to discourage, more

and more, industrial combatants from pressing their demands by all available means to the limits of the justification of self-interest. This calls for appropriate judicial construction of existing legislation. The statute lays its emphasis upon reason and a willingness to employ it as the dominant force in bargaining. That emphasis is respected by declining to take as a postulate of the duty to bargain that the legally impermissible exertions of so-called economic pressure must be restricted to the crudities of brute force. Cf. *Labor Board* v. *Fansteel Metallurgical Corp.*, 306 U. S. 240.

However, it of course does not follow because the Board may find in tactics short of violence evidence that a party means not to bargain in good faith that every such finding must be sustained. Section 8 (b) (3) itself, as previously construed by the Board and this Court and as amplified by § 8 (d), provides a substantial limitation on the Board's becoming, as the Court fears, merely "an arbiter of the sort of economic weapons the parties can use in seeking to gain acceptance of their bargaining demands." The Board's function in the enforcement of the duty to bargain does not end when it has properly drawn an inference unfavorable to the respondent from particular conduct. It must weigh that inference as part of the totality of inferences which may appropriately be drawn from the entire conduct of the respondent, particularly its conduct at the bargaining table. The state of mind with which the party charged with a refusal to bargain entered into and participated in the bargaining process is the ultimate issue upon which alone the Board must act in each case, and on the sufficiency of the whole record to justify its decision the courts must pass. *Labor Board* v. *American National Ins. Co.*, 343 U. S. 395.

The Board urges that this Court has approved its enforcement of § 8 (b) (3) by the outlawry of conduct *per se*, and without regard to ascertainment of a state of

mind. It relies upon four cases: *H. J. Heinz Co. v. Labor Board,* 311 U. S. 514; *Labor Board* v. *Crompton-Highland Mills,* 337 U. S. 217; *Labor Board* v. *F. W. Woolworth Co.,* 352 U. S. 938; and *Labor Board* v. *Borg-Warner Corp.,* 356 U. S. 342. These cases do not sustain its position. While it is plain that the *per se* proscription of an employer's refusal to reduce a collective agreement to writing was approved in the *Heinz* case, it is equally plain from its opinion in that case as well as its argument before this Court that the Board itself regarded the act of refusal to agree to the integration of the agreement in a writing as a manifestation that the employer's state of mind was hostile to agreement with the union. This Court so regarded the evidence. 311 U. S., at 525–526. Decision in the *Borg-Warner* case proceeded from a similar premise. By forcing a deadlock upon a non-statutory subject of bargaining the employer manifested his intention to withdraw the statutory subjects from bargaining. The *Crompton-Highland* decision rested not on approval of a *per se* rule that unilateral changes of the conditions of employment by an employer during bargaining constitute a refusal to bargain, but upon the inferences of a lack of good faith which arose from the facts, among others, that the employer instituted a greater increase than it had offered the union and that it did so without consulting the union. Finally, no such conclusion as the Board urges can be drawn from the summary disposition of the *Woolworth* case here.[4] To the extent that in any of these cases

---

[4] The Court held that "The Board acted within its allowable discretion in finding that under the circumstances of this case failure to furnish the wage information constituted an unfair labor practice." It cited *Labor Board* v. *Truitt Mfg. Co.,* 351 U. S. 149; and in *Truitt* the entire Court was in agreement both that the withholding of wage information by the employer was weighty evidence of a lack of willingness to bargain sincerely, and that the judgment of the Board had to be predicated on all the facts pertinent to state

language referred to a *per se* proscription of conduct it was in relation to facts strongly indicating a lack of a sincere desire to reach agreement.

Moreover, in undertaking to fashion the law of collective bargaining in this case in accordance with the command of § 8 (b)(3), the Board has considered § 8 (b)(3) in isolation, as if it were an independent provision of law, and not a part of a reticulated legislative scheme with interlacing purposes. It is the purposes to be drawn from the statute in its entirety, with due regard to all its interrelated provisions, in relation to which § 8 (b)(3) is to be applied. Cf. *Textile Workers Union* v. *Lincoln Mills,* 353 U. S. 448, 456. A pertinent restraint on the Board's power to consider as inimical to fair bargaining the exercise of the "economic" weapons of labor is expressed in the Act by § 13: [5]

> "Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right."

Section 501 (2) of the Labor Management Relations Act provides a definition of "strike": [6]

> "When used in this Act—... (2) The term "strike" includes any strike or other concerted stoppage of

of mind. 351 U. S., at 153, 155. Moreover, the lower court in the *Woolworth* case found that the Board had not proceeded by a per se determination, 235 F. 2d 319, 322 (C. A. 9th Cir.), but that there was no basis for its conclusion that the information requested was relevant to administration of the agreement.

[5] While the Board does consider these sections in connection with respondent's assertion that they afford protection to its conduct from Board regulation, see n. 8, *infra,* it does not consider their application as a rule of construction of § 8 (b)(3).

[6] Although I am in sympathy with the Court's conclusion that the construction of § 8 in this case is to be uninfluenced by what

> work by employees (including a stoppage by rea-
> son of the expiration of a collective-bargaining
> agreement) and any concerted slow-down or other
> concerted interruption of operations by employees."

As the last clause of § 13 makes plain, the section does not recognize an unqualified right, free of Board interference, to engage in "strikes," as respondent contends. The Senate Report [7] dealing with the addition of the clause to the section confirms that its purpose was to approve the elaboration of limitations on the right to engage in activities nominally within the definition of § 501 (2) which this Court had heretofore developed in such cases as *Labor Board* v. *Fansteel Metallurgical Corp., supra; Labor Board* v. *Sands Mfg. Co.,* 306 U. S. 332; and *Southern S. S. Co.* v. *Labor Board,* 316 U. S. 31. But "limitations and qualifications" do not extinguish the rule. For the Board to proceed, as it apparently claims

---

was said in *Automobile Workers* v. *Wisconsin Board,* 336 U. S. 245, I do not agree that that case held that the definitions of § 501 (2) are inapplicable to § 13. The question which the Court there considered was whether § 13, as defined in § 501 (2), independently rendered activities within its terms immune from state regulation. The Court's observation that for § 501 (2) to have so extended the force of § 13 would have been inconsistent with the purpose of the inclusion of the definition, which was to extend the Board's power with reference to the unfair labor practice defined by § 8 (b) (4), 336 U. S., at 263, was made in light of the contention that § 13 itself had the effect of precluding the States. The crux of the decision with regard to § 13 was that it announced no more than a rule of construction of the Federal Act. It was neither argued nor decided that § 501 (2) does not apply to § 13. There appears to be no support for such a conclusion either in the text of the Act or in its legislative history. It is hardly conceivable that such a word as "strike" could have been defined in these statutes without congressional realization of the obvious scope of its application.

[7] S. Rep. No. 105, 80th Cong., 1st Sess. (1947), at p. 28. This provision of the Taft bill was adopted by the Conference. H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. (1947), at p. 59.

power to do, against conduct which, but for the bargaining context in which it occurs, would not be within those limitations,[8] it must rely upon the specific grant of power to enforce the duty to bargain which is contained in § 8 (b)(3). In construing that section the policy of the rule of construction set forth by § 13, see *Automobile Workers* v. *Wisconsin Board,* 336 U. S. 245, 259, must be taken into account. In the light of that policy there is no justification for divorcing from the total bargaining situation particular tactics which the Board finds undesirable, without regard to the actual-conduct of bargaining in the case before it.

The scope of the permission embodied in § 13 must be considered by the Board in determining, under a proper rule of law, whether the totality of the respondent's conduct justifies the conclusion that it has violated the "specific" command of § 8 (b)(3). When the Board emphasizes tactics outside the negotiations themselves as the basis of the conclusion that the color of illegitimacy is imparted to otherwise apparently bona fide negotiations, § 13 becomes relevant. A total, peaceful strike in compliance with the requirements of § 8 (d) would plainly not suffice to sustain the conclusion; prolonged union-sponsored violence directed at the company to secure com-

---

[8] The Board urges that respondent's activities are not within the "dispensation or protection" of § 13, because *Automobile Workers* v. *Wisconsin Board,* 336 U. S. 245, held "slowdowns" to be "unprotected" activities subject to state regulation. The argument misreads the significance of that case as regards § 13. See n. 6, *supra.* Nor is it valid to assume that all conduct loosely described as a "slowdown" has the same legal significance, or that union sponsorship of such conduct falls within the "limitations or qualifications" on the right to strike incorporated in § 13 in every case in which employee participation in it would be "unprotected" by § 7, and therefore subject to economic retaliation by the employer. See the portions of the Board's order quoted in n. 1, *supra.*

pliance as plainly would. Here, as in so many legal situations of different gradations, drawing the line between them is not an abstract, speculative enterprise. Where the line ought to be drawn should await the decision of particular cases by the Board. It involves experienced judgment regarding the justification of the means and the severity of the effect of particular conduct in the specialized context of bargaining.

Section 8 (d), which was added in the amendments of 1947, is also inconsistent with the Board's claim of power to proscribe conduct without regard to the state of mind with which the actor participated in negotiations. The 1935 Act did not define the "practice and procedure of collective bargaining" which it purposed to "encourage." Act of July 5, 1935, § 1, 49 Stat. 449. That definition, until 1947, was evolved by the Board and the courts in the light of experience in the administration of the Act. See, *e. g., H. J. Heinz Co.* v. *Labor Board, supra.* In 1947, after considerable controversy over the need to objectify the elements of the duty to bargain, § 8 (d) was enacted. We have held that the history of that enactment demonstrates an intention to restrain the Board's power to regulate, whether directly or indirectly, the substantive terms of collective agreements. *Labor Board* v. *American National Ins. Co., supra,* at 404. In the same case we recognized that implicit in that purpose is a restraint upon the Board's proceeding by the proscription of conduct *per se* and without regard to inferences as to state of mind to be drawn from the totality of the conduct in each case. *Id.,* at 409.

Finally, it is not disputed that the duty to bargain imposed on unions in 1947 was the same as that previously imposed on employers, and it is therefore not without significance for its present assertion of power that for 25 years of administration of the employer's duty

to bargain, which was imposed by the Act of 1935 and preserved by the amendments of 1947, the Board has not found it necessary to assert that it may proscribe conduct as undesirable in bargaining without regard to the actual course of the negotiations. See *Federal Trade Comm'n v. Bunte Bros.*, 312 U. S. 349, 351–352.

These considerations govern the disposition of the case before the Court. Viewed as a determination upon all the evidence that the respondent bargained without the sincere desire to compose differences and reach agreement which the statute commands, the Board's conclusion must fall for want of support in the evidence as a whole. See *Universal Camera Corp.* v. *Labor Board, supra.* Apart from any restraint upon its conclusion imposed by § 13, a matter which the Board did not consider, no reason is manifest why the respondent's nuisance tactics here should be thought a sufficient basis for the conclusion that all its bargaining was in reality a sham. On this record it does not appear that respondent merely stalled at the bargaining table until its conduct outside the negotiations might force Prudential to capitulate to its demands, nor does any other evidence give the color of pretence to its negotiating procedure. From the conduct of its counsel before the Trial Examiner, and from its opinion, it is apparent that the Board proceeded upon the belief that respondent's tactics were, without more, sufficient evidence of a lack of a sincere desire to reach agreement to make other consideration of its conduct unnecessary. For that reason the case should be remanded to the Board for further opportunity to introduce pertinent evidence, if any there be, of respondent's lack of good faith.

Viewed as a determination by the Board that it could, quite apart from respondent's state of mind, proscribe its tactics because they were not "traditional," or were

thought to be subject to public disapproval, or because employees who engaged in them may have been subject to discharge, the Board's conclusion proceeds from the application of an erroneous rule of law.·

The decision of the Court of Appeals should be vacated, and the case remanded to the Board for further proceedings consistent with these views.