[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this appeal the parties call upon the court to determine the survivor of what the parties perceived as a head-on collision between the Groton City Charter and a state statute. As will be developed below, no collision occurs.
The dispute centers on a vote of the Groton City Council taken on August 26, 1991. The council consists of six councilors. At that meeting, four councilors were present. A vote on a resolution to accept and ratify a "new pension agreement" for the City's fire fighters was taken. Three of the council voted for the "new pension agreement," one voted against.
Relying on the Charter's "No vote shall be adopted except on the approval of a majority of councilors" provision, the Mayor declared the resolution "to accept and ratify" did not pass.
The Fire Fighters' Union then filed a prohibited practice complaint with the defendant State Board of Labor Relations. The complaint alleged violations of the Municipal Employees Relations Act (MERA), C.G.S. §§ 7-467 et seq. A part of MERA provides that any request for funds necessary to fund a collective bargaining agreement and for approval of a any provisions of the agreement conflicting with certain laws shall be submitted to the legislative body of the municipality "which may accept or reject such request as a whole by a majority vote of those present and voting on the matter." C.G.S. § 7-474 (b). The defendant board held that the August 26 vote (three council members in favor of the resolution to accept and ratify the "new pension agreement," one opposed) was actually a vote on a request for funds and for approval of any provisions of the agreement which conflicted with other laws as authorized by C.G.S. § 7-474 (b). The three-to-one vote was a majority vote of those present and voting, and according to the defendant State Board of Labor Relations (SBLR), was an approval of a request for funds and for approval of any the agreement's provisions in conflict with [certain enumerated laws]. The Labor Board then held approval of that request constituted approval of the "new pension agreement."
On November 24, 1993, the defendant State Board of Labor Relations "ordered that the City `. . . cease and desist from CT Page 3422 failing to implement the [agreement] reflected in writing of July, 1991 and acted on by the City Council on August 26, 1991.'" Complaint, ¶ 14; Answer, ¶ 14.
This appeal by the City of Groton followed.
FACTS
The subordinate fact findings of the Board are largely unchallenged.
The City and the Fire Fighters Union had been negotiating changes in the existing fire fighters' pension agreement for some time. In May 1991, negotiators for the Fire Fighters Union and the City reached tentative agreement on a "new pension agreement." The "new pension agreement" was for a five year period, July 1, 1991 through July 1, 1996. As of July 9, 1991, it was reduced to writing. SBLR Exhibit 24.
The "new pension agreement provided:
 "Effective July 1, 1991, `Final Average Earnings' means a participants [Sic] annual base salary, or wage paid or accrued during a calendar year, exclusive of all other earnings including outside earnings, accumulated sick leave or other employment with the City of Groton, provided the participant has made contributions hereunder, averaged over the highest three (3) calendar years of employment as a fireman." Exhibit 24, 29.
 "Effective July 1, 1991, the participants Final Average Earnings shall include $1,000 overtime earnings. "Effective July 1, 1993, the participants Final Average Earnings shall include $1,500 overtime earnings. "Effective July 1, 1995, the participants Final Average Earnings shall include $1,500 overtime earnings." Exhibit 24, 29.
 "4. Employee Contributions: Effective July 1, 1991, participants shall contribute 7 1/2% of their base monthly annual earnings, including overtime as specified in paragraph 2. (b), but excluding all other earnings." Exhibit 24, 29.
Three provisions of the "new pension agreement" altered the CT Page 3423 existing pension agreement. One increased the employees contribution from 71/4% to 71/2% of their base annual earnings including certain overtime.[1] A second required the inclusion of a limited amount of overtime earnings to be included in the "final average earnings." Another provision provided that the fire fighters' "final average salary" would be based on the " highest three (3) calendar years of service instead of the highest five years of service.[2]
The "new pension agreement" as agreed upon by the Union and City negotiators specifically stated: "This Agreement is subject to approval of the Groton City Council." Record, Item 24, ¶ 9.
The existing pension agreement contained the following:
ARTICLE IX — FUNDING
 Section 9.1 Contributions of the Employer — The Retirement Board shall, at least once every three years, be required to have an actuarial valuation by an actuary of the assets and liabilities of the Retirement Plan and of the required contributions from the Employer which, in addition to contributions of the Participants, will be adequate to finance the benefits under the Retirement Plan.
 On the basis of each such evaluation, the Employer shall pay each year to the Retirement Board an amount which will meet the actuarial cost of current service and, until it is amortized, the unfunded accrued liability. The annual appropriation by the Employer for each of the forty (40) plan years, beginning January 1, 1976, shall be the sum of the normal cost for the year and the annual payment that would be required on a level basis to amortize the unfunded accrued liability over (40) years from January 1, 1976. The appropriation for each plan year thereafter shall be the normal cost for the year. Any proposal which will change the benefits payable or Participant Contributions required under the Retirement Plan shall be accompanied by an estimate by the actuary of the additional appropriations by the Employer which will be required to finance the additional normal cost and to amortize on a level basis the additional accrued liability over forty (40) years from the effective date CT Page 3424 of the change.
 Section 9.2 No part of the funds held under this Plan shall be used for or diverted to purposes other than for the exclusive benefit of Participants, their spouses or their dependents heretofore described, prior to the satisfaction of all liabilities hereunder with respect to them. Also, no person shall have any interest in nor right to any of the funds contributed to or held under this Plan, except as expressly provided in this Plan and the Group Annuity Contract, and then only to the extent that such funds have been contributed by the Employer.
Retirement Plan for Policeman and Firemen of the City of Groton, Connecticut, Amended and Restated Effective April 1, 1976, pp. 12-13, Exhibit 5.
The matter of the "new pension agreement" appeared on the agenda of the July 15, 1991 meeting of the Mayor and Council as a resolution to accept and ratify the "new pension agreement." The agenda contained the following:
 R-91-7-83 RESOLUTION TO RATIFY THE MEMORANDUM OF AGREEMENT BETWEEN THE CITY OF GROTON AND THE INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, AFL-CIO, LOCAL 1964, REGARDING THE CITY PENSION PLAN, EFFECTIVE UNTIL JULY I, 1996.
 WHEREAS, through the process of negotiations, the City of Groton and the International Association of Fire Fighters, AFL-CIO, Local 1964, have reached a memorandum of agreement regarding the City Pension Plan,
 THEREFORE BE IT RESOLVED the Mayor and Council accept and ratify the Memorandum of Agreement between the City of Groton and the International Association of Fire Fighters, AFL-CIO, Local 1964, regarding the City Pension Plan, effective until July 1, 1996.
Mayor and Council Agenda, July 15, 1991, p. 5, Record, Item 7.
The minutes for the July 15, 1991 Council meeting state: CT Page 3425
 R-91-7-83 RESOLUTION TO RATIFY THE MEMORANDUM OF AGREEMENT BETWEEN THE CITY OF GROTON AND THE INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, AFL-CIO, LOCAL 1964, REGARDING THE CITY PENSION PLAN, EFFECTIVE UNTIL JULY I, 1996.
 WHEREAS, through the process of negotiations, the City of Groton and the International Association of Fire Fighters, AFL-CIO, Local 1964, have reached a memorandum of agreement regarding the City Pension Plan,
 THEREFORE BE IT RESOLVED the Mayor and Council accept and ratify the Memorandum of Agreement between the City of Groton and the International Association of Fire Fighters, AFL-CIO, Local 1964, regarding the City Pension Plan, effective until July 1, 1996.
 COUNCILOR GIESING moved, COUNCILOR COLLINS second, Resolution R-91-7-83 be approved.
 VOTE: FOR AGAINST ABSTAIN COLLINS GERRISH HAVILAND GIESING DUNBAR-ROSE STARK
SO VOTED and declared DEFEATED by Mayor Kolnaski.
Minutes of Meeting of Mayor and Council, July 15, 1991, pp. 15, Record, Exhibit 8.
The Mayor and all six members of the Council were present at the July 15, 1991 meeting. The resolution to "accept and ratify the Memorandum of Agreement . . . regarding the City Pension Plan" was voted on by the Council. Two councilors, Collins and Giesing, voted "For" the pension agreement. Three, Gerrish, Dunbar-Rose, and Stack, voted "Against." Councilor Haviland abstained. Decision No. 3161, Findings, ¶ 14, p. 4. The resolution "to accept and ratify" did not pass.
The Mayor and Councilors met on August 26, 1991. The matter of the "new pension agreement" again was on the agenda. CT Page 3426
 R-91-8-101 RESOLUTION TO RATIFY THE MEMORANDUM OF AGREEMENT BETWEEN THE CITY OF GROTON AND THE INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, AFL-CIO, LOCAL 1964, REGARDING THE CITY PENSION PLAN, EFFECTIVE UNTIL JULY I, 1996.
 WHEREAS, through the process of negotiations, the City of Groton and the International Association of Fire Fighters, AFL-CIO, Local 1964, have reached a memorandum of agreement regarding the City Pension Plan,
 THEREFORE BE IT RESOLVED the Mayor and Council accept and ratify the Memorandum of Agreement between the City of Groton and the International Association of Fire Fighters, AFL-CIO, Local 1964, regarding the City Pension Plan, effective until July 1, 1996.
Mayor and Council Agenda, August 26, 1991, p. 3, Record, Item 13.
The action on the resolution to accept and ratify the "new pension agreement" is recorded in the Council minutes as follows:
 R-91-8-101 RESOLUTION TO RATIFY THE MEMORANDUM OF AGREEMENT BETWEEN THE CITY OF GROTON AND THE INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, AFL-CIO, LOCAL 1964, REGARDING THE CITY PENSION PLAN, EFFECTIVE UNTIL JULY I, 1996.
 WHEREAS, through the process of negotiations, the City of Groton and the International Association of Fire Fighters, AFL-CIO, Local 1964, have reached a memorandum of agreement regarding the City Pension Plan,
 THEREFORE BE IT RESOLVED the Mayor and Council accept and ratify the Memorandum of Agreement between the City of Groton and the International Association of Fire Fighters, AFL-CIO, Local 1964, regarding the City Pension Plan, effective until July 1, 1996.
COUNCILOR HAVILAND moved, COUNCILOR COLLINS second, CT Page 3427 Resolution R-91-8-101 be approved.
 COUNCILOR GERRISH stated he requested this proposal be considered again because since the first time it was considered he has gathered information which supports the proposed pension plan.
 COUNCILOR HAVILAND stated because he is a volunteer member of the fire department and not paid, he would be voting on this proposal.
 VOTED: FOR AGAINST ABSTAIN COLLINS DUNBAR-ROSE GERRISH HAVILAND
SO VOTED and declared DEFEATED by Mayor Kolnaski.
Minutes of Special Meeting of Mayor and Council, August 26, 1991, pp. 7-8, Record, Exhibit 14.
As the minutes state, the Mayor and only four councilors were present at his meeting. Three of the council voted to accept and ratify the "new agreement," one voted against.
The City Charter contains the following provision:
 "At any meeting of the mayor and councilors, a total of five (5) shall constitute a quorum for transaction of business. No vote shall be adopted except on the approval of a majority of councilors." Charter, Article III, Section 5.
The Mayor declared the matter had not been approved because the Charter provided that adoption of any matter required a majority vote of the full council. Decision No. 3161, Findings, ¶¶ 20-23, p. 5.
The Fire Fighters Union then filed a complaint with the defendant State Board of Labor Relations. The complaint stated:
 "Mayor Catherine Kolnaski refuses to support the pension agreement she negotiated with the Union even though 4 of the 6 City Councilors have voted in favor of the agreement during two separate Council votes by CT Page 3428 insisting on further Union concession.
 "Mayor Kolnaski failed to support the negotiated agreement during a 3 to 1, in favor, Council vote, where her vote would have constituted the majority of the full Council during the absence of 2 Councilors. "Section 7-470 c.
 "The Union believes that Mayor Kolnaski should support the negotiated agreement between herself and the Union, and that her vote should have ratified the agreement."
Complaint, MPP-14093, filed September 18, 1991; MERA, MC-3-80; Court Exhibit 1.[3]
The Fire Fighters filed an amended complaint on December 27, 1991. The amended complaint alleged:
 Sections 7-470 (c) and 7-474 (b, c) have been violated by the City by;
 1) Mayor failed to present the agreement to the City Council within 14 days of May 10, 1991 by submitting agreement on July 15, 1991.
 2) Mayor failed to allow the City Council to act on the agreement within 30 days from the end of the 14 day period allowed for submittal by presenting agreement to the City Council on July 15, 1991.
 3) Mayor failed to return the agreement to the parties for future bargaining after the July 15, 1991 Council vote, and the August 26 Council vote.
 4) Mayor refuses to negotiate in good faith by 11 not replying to the Union's October 3, 1991 letter.
 5) Mayor refused to allow the City Council to reconsider their vote at the September 16, 1991 Council meeting.
6) Mayor refused to accept the majority vote of CT Page 3429 the City Council at the August 26, 1991 Council meeting which voted 3 to 1 in favor of agreement.
 7) Mayor refuses to negotiate a Council recommended change to the agreement as directed by a 4 to 2 Council vote on September 23, 1991.
 8) Mayor has bargained in bad faith by not supporting the agreement she negotiated knowing that 4 of the 6 City Councilors support it.
The Union believes that the City did not act on the negotiated agreement within the timely manner mandated; that the City Council approved the agreement by majority vote on August 26, 1991, therefore, a binding agreement exists between the parties.
The City should be held responsible for any costs placed upon the Union, including retroactive pension contributions to July 1, 1991.
Amended Complaint, MPP-14, 093, filed December 27, 1991, MERA MC-3-80. Court Exhibit 2.
The SBLR heard the parties on July 6, 1992 and September 4, The City of Groton filed with the Board on October 15, 1992.
Thirteen months later, on November 24, 1993 the SBLR rendered its decision and order which is the subject of this appeal. SBLR Decision No. 3161 (November 24, 1963).
The SBLR found:
 "24. The August 26 vote (three council members in favor of the resolution to accept and ratify the pension agreement, one opposed) constituted approval of the `request for funds' and approval of `any provisions of the agreement, which are in conflict with any charter, special act, ordinance, rule or regulation by a majority vote of those present and voting on the matter', [Sic] within the meaning of § 7-474 (b)." SBLR Decision No. 3161, Findings, ¶ 24, p. 5.
CT Page 3430
Then, the SBLR concluded:
 "In summary, we conclude that the August 26 vote constituted, under § 7-474 (b), approval of a request for funds for the pension agreement and approval of any provisions of the pension agreement in conflict with any existing legal creations of the City (as such creations are enumerated in § 7-474 (b). Thus, a valid and binding pension agreement exists." [Footnotes omitted.] SBLR Decision No. 3161, Discussion, p. 8-9.
The SBLR held that the August 26 three-to-one vote on the resolution to accept and ratify the pension agreement, which had failed to carry because of the "majority of the councilors" requirement of the Charter, actually was a vote on a "request for funds necessary to implement such written agreement and for approval of any provisions of the agreement which are in conflict with [certain enumerated laws] . . ." under C.G.S. § 7-474 (b) which could be approved or rejected "by a majority vote of those present and voting on the matter."
Having concluded that the "new pension agreement" was approved by the City Council on August 26, 1991, the SBLR held "the City committed a prohibited practice by not recognizing and implementing" the "new pension agreement." In the Matter of Cityof Groton and Local 1964, IAFF, SBLR Decision No. 3161, November 24, 1993, Discussion, p. 9.
The defendant SBLR entered an order that the City of Groton shall "[c]ease and desist from failing to implement the Pension Agreement reflected in the writing of July, 1991 and acted on by the City Council on August 26, 1991."
The City has filed this appeal.
Further facts will be set forth where relevant.
AGGRIEVEMENT
The plaintiff bears the burden of showing aggrievement in this appeal taken pursuant to the Uniform Administrative Procedure Act. C.G.S. § 4-183 (a). Aggrievement must be established by in-court evidence; aggrievement is not established by the administrative record. State Library v. Freedom ofCT Page 3431Information Commission, 41 Conn. App. 641 (June 11, 1996); certifications (2) granted, 239 Conn. 903-4 (September 18, 1996). A stipulation of fact, the functional equivalent of evidence, may be used to establish aggrievement. The parties have stipulated that the Board issued the cease and desist order against the City of Groton which was served on the City. Transcript of Court Proceedings, 10/29/1996, p. 2. The plaintiff, City of Groton, is aggrieved; it has been found to have committed a prohibited practice and an order was issued against the City by the defendant State Board of Labor Relations ordering the City to cease, and desist from, the prohibited practice.
The court finds the plaintiff City of Groton was and is aggrieved by the defendant Board's action.
DISCUSSION
The crucial issue is whether the Groton City Council had approved the "new pension agreement" with the Fire Fighters Union on August 26, 1991.
Negotiators for the Fire Fighters and the City negotiated on the terms of a new pension agreement. Eventually agreement was reached and later those terms were incorporated into a "new pension agreement." Exhibit 24.
The "new pension agreement" specifically provided: "This agreement is subject to approval of the Groton City Council." Record, Item 24, ¶ 9.
The "new pension agreement" came before the City Council as a resolution on July 15, 1991, and again on August 26, 1991. Except for the identifying numbers, the resolution item was stated in the agendas and the minutes for both meetings in identical text. [The relevant entries from these agendas and minutes are set forth verbatim at pages 6-9. above.]
Knowing that the agreement itself required council approval, a normal reading of the City Council agendas and minutes would lead to the conclusion that the City Council action was in furtherance of the requirement of the agreement. Nowhere in its memorandum of decision does the SBLR express any recognition of the fact that the negotiated "new pension agreement" by its own specific terms required City Council approval. The "new pension agreement's" requirement for Council approval existed therefore CT Page 3432 independent of any MERA statutory requirement.
The SBLR states:
 "Although the Union alleges multiple violations of the Act on various actions and conduct by the Mayor with regard to negotiation of the pension agreement, one aspect of its charge has overriding significance. Specifically, it claims that a binding pension agreement exists between the parties as a result of the City Council's vote of August 26, 1991. Since the status of the pension plan is of paramount concern, we address that issue first, and then turn to the other specific allegations.
 "We agree with the Union that a binding pension agreement exists by virtue of the August 26 City Council vote. Section 7-47 (b) provides that the legislative body may approve or reject as a whole, "by a majority vote of those present and voting on the matter," 1) a request for funds necessary to implement such written agreement and 2) a request for approval of any provision of the agreement which is in conflict with any charter, special act, ordinance, rule or regulation, or certain General Statutes. It is undisputed that the tally of votes on August 26 — three in favor and one against — reflected that a majority of those present and voting on the matter approved the version of the pension agreement, which originally had come before the Council on July 15, 1993. Although the Town Charter provides that motions do not carry unless a majority of the full Board approves it — i.e., in this case four votes, we conclude that the statute is so explicit as to the nature of the vote required that it takes precedence over that Charter provision.
 "We recognize that the initial July 15 vote, on this same version of the pension agreement, resulted in rejection of the agreement, but we find no basis in this fact for ignoring the clear wishes of the majority of those councilors voting on the same proposal at a subsequent meeting, particularly where the agenda provided notice that the same resolution was up for a vote.
CT Page 3433
 "The statutory scheme contemplates that the legislative body will act on the written agreement between the chief executive officer and the Union. There is absolutely no evidence here that the basic agreement between the chief executive officer (the Mayor) and the Union had been altered because no new negotiations had occurred, no new positions had been communicated, and in fact, the negotiators had not even talked in the interim. All that was still lacking was the approval of the legislative body, and that was finally given on August 26. The Act encourages collective bargaining and voluntary agreement of the parties. It would be contrary to those purposes to ignore a statutorily correct approval and force the parties to arbitrate where they have reached agreement.
 "While the Mayor challenges the propriety of the August 26 vote under Robert's Rules concerning `reconsiderations,' we note that Robert's Rules had never been officially adopted by the Mayor and Council, and thus we decline to let a technical argument involving conformity with those Rules stand in the way of a vote, which meets the statutory requirements. We also decline to determine whether or not the argument is valid.
 "In summary, we conclude that the August 26 vote constituted, under § 7-474 (b), approval of a request for funds for the pension agreement and approval of any provisions of the pension agreement in conflict with any existing legal creations of the City (as such creations are enumerated in § 7-474 (b). Thus, a valid and binding pension agreement exists." City of Groton, Decision No. 3181 (1993), pp. 8-9.
Section 7-474 (b) played a pivotal role in the SBLR's decision. It provides:
 "Any agreement reached by the negotiators shall be reduced to writing. Except where the legislative body is the town meeting, a request for funds necessary to implement such written agreement and for approval of any provisions of the agreement which are in conflict with any charter, special act, ordinance, rule or regulation adopted by the municipal employer or its CT Page 3434 agents, such as a personnel board or civil service commission, or any general statute directly regulating the hours of work of policemen or firemen or any general statute providing for the method or manner of covering or removing employees from coverage under the Connecticut municipal employees' retirement system or under the Policemen and Firemen Survivors' Benefit Fund shall be submitted by the bargaining representative of the municipality within fourteen days of the date on which such agreement is reached to the legislative body which may approve or reject such request as a whole by a majority vote of those present and voting on the matter; but, if rejected, the matter shall be returned to the parties for further bargaining. Failure by the bargaining representative of the municipality to submit such request to the legislative body within such fourteen-day period shall be considered to be a prohibited practice committed by the municipal employer. Such request shall be considered approved if the legislative body fails to vote to approve or reject such request within thirty days of the end of the fourteen-day period for submission to said body. Where the legislative body is the town meeting, approval of the agreement by a majority of the selectmen shall make the agreement valid and binding upon the town and the board of finance shall appropriate or provide whatever funds are necessary to comply with such collective bargaining agreement." C.G.S. § 7-474 (b).
The linchpin of the SBLR's innovative rationale is the two-step improvisation it fashioned to reach its conclusion. According to the City Charter, to pass, a resolution to "accept and ratify" would need a majority of the councilors, four, voting for the resolution. On August 26, the vote was only three-to-one in favor of the resolution. As a vote to accept and ratify or to approve the "new pension agreement, the vote failed. So, the SBLR, as an initial step, called the August 26, 1991 vote "to accept and ratify" the "new pension agreement" an "approval of the `request for funds' and approval of `any provisions of the agreement which are in conflict with any charter special act, ordinance, rule or regulation. . . .[']" Decision No. 3181, Findings of Fact, ¶ 24, p. 5. A "C.G.S. § 7-474 (b) request"[4] is approved "by a majority vote of those present and voting on the matter" rather than the Charter's "majority of the councilors" provision. The August 26, 1991 vote, by SBLR legerdemain, having CT Page 3435 become a vote on a "C.G.S. § 7-474 (b) request" so it could be passed by "majority vote of those present and voting," was then re-christened an approval of the "new pension agreement." There is nothing in the record made before the SBLR which substantiates or justifies this process or result. This transmogrification has its origins in the post-hearing doings of the SBLR. As is shown below, there is no basis for it in the record before the SBLR or the law.
The court has carefully reviewed the record. First, the original complaint the Fire Fighters filed with the SBLR does not make, or even hint of, any claim that C.G.S. § 7-474 (b) was violated or that a "C.G.S. § 7-474 (b) request" was involved. The original complaint does cite "C.G.S. § 7-470 c," which probably was meant to be a reference to C.G.S. § 7-470 (c). Court Exhibit 1. The SBLR described that complaint as "alleging that the City of Groton (the City) had engaged and was engaging in practices prohibited by § 7-470 of the Municipal Employees Relations Act (the Act)." SBLR Decision 3181, p. 1.
The amended complaint states that "[sections 7-470 (c) and7-474 (b, c) have been violated by the City by. . . ." Eight numbered paragraphs follow. Only one even suggests the August 26, 1991 vote approved the "new pension agreement." That paragraph states:
 6) Mayor refused to accept the majority vote of the City Council at the Aug 26, 1991 Council meeting which voted 3 to 1 in favor of agreement." Court Exhibit 2.
An unnumbered paragraph followed, part of which may be relevant here:
 "The Union believes . . . that the City Council approved the agreement by majority vote on Aug. 26, 1991, therefore a binding agreement exist between the parties." Court Exhibit 2.
The SBLR states the Fire Fighters' amended complaint "[s]pecifically . . . claims that a binding pension agreement exists between the parties as a result of the City's Council's vote on August 26, 1991." Decision No. 3181, p. 7.
No fair reading of the amended complaint would alert anyone that the Union claimed pursuant to C.G.S. § 7-474 (b) that the CT Page 3436 August 26, 1991 vote was a vote on a request (1) for funds necessary to implement the "new pension agreement" and, (2) for approval of any provisions of the "new pension agreement" which conflicted with certain existing laws. The word "request" does not even appear in the complaint or amended complaint. See Exhibits 1 and 2. The Union's allegations that the August 26, 1991 three to one vote "in favor of agreement," and "the City Council approved the agreement by majority vote" evince no more than its position that the majority vote prevailed because of the Union's failure and/or refusal to recognize the "[n]o vote shall be adopted except on the approval of a majority of the councilors" requirement of the City Charter. The amended complaint does not set forth a Union made claim that the August 26, 1991 three-to-one vote "to accept and ratify" the "new pension agreement" was a vote pursuant to C.G.S. § 7-474 (b) on a request for funds and approval of those provisions of the "new pension agreement" which were in conflict with certain laws which then became an approval of the "new pension agreement." The amended complaint does not indicate any awareness of, or reliance on, the "majority vote of those present and voting on the matter" provision of C.G.S. § 7-474 (b). This is borne out by the testimony at the SBLR's hearing; Ellis Hartman, the Fire Fighters President, who signed the original and the amended complaint, testified that he thought the "new pension agreement" was approved because the three to one vote in favor was a vote of the majority. See Transcript of Proceedings, 7/6/1992, p. He did not indicate any awareness of the Charter's majority of the councilors provision.[5] Nor did he indicate any awareness of or reliance on the "majority vote of those present and voting on the matter" provision of C.G.S. § 7-474 (b) and/or a "C.G.S. § 4-474 (b) request." The amended complaint does not, by any plausible reading or interpretation, make or set forth a claim such as that found and relied upon by the SBLR.
The Fire Fighters' amended complaint did not appraise either the City or the SBLR that the Fire Fighters were claiming that the August 26, 1991 vote was an approval of the new pension agreement because it was a vote on a "C.G.S. § 7-474 (b) request."
The court has examined the transcript of the two-day hearing held by the SBLR. Nothing in that record even suggests the fire fighters claimed the August 26, 1991 vote was a vote on "C.G.S. §7-474 (b) request." The word "request" does not even appear in the transcript. While "C.G.S. § 7-474 (b)" is mentioned several times, it is not mentioned in the context of the August 26, 1991 CT Page 3437 vote being a vote on a "request" as authorized by that section. The fire fighters presented nothing by way of evidence or argument contending that the August 26, 1991 vote was a vote pursuant to C.G.S. § 7-474 (b) and therefore subject to its "majority vote of those present and voting" lower vote requirement.
The transcript of the SBLR proceedings makes no reference to the "majority vote of those present and voting" provision of C.G.S. § 7-474 (b). Neither the Fire Fighters nor the SBLR ever mentioned or suggested that the "majority vote of those present and voting" provision of C.G.S. § 7-474 (b) was or even might be involved.
After the close of the evidentiary hearing on September 4, 1992, the Fire Fighters, although indicating it would file a brief, did not file any brief with the SBLR. Transcript of SBLR Proceedings, 9/4/92, p. 90. The City of Groton filed a brief on October 15, 1992. It did not address any issue contemplating that the August 26, 1991 vote involved a "C.G.S. § 7-474 (b) request" and the lower vote requirement of C.G.S. § 7-474 (b). This is at least some indication that the City was not aware that there was an issue as to the August 26, 1991 vote's being a vote on a "C.G.S. § 4-474 (b) request."
Thus, as of October 15, 1992, the SBLR record is totally void of any indication that the August 26, 1991 vote of the Groton City Council was a vote on a "C.G.S. § 4-474 (b) request" and therefore could be, or was approved, by virtue of the lower vote requirements of C.G.S. § 4-474 (b).
The first time the record shows anything to the effect that the August 26, 1991 vote was a vote on a "C.G.S. § 4-474 (b) request" was when the SBLR issued its decision on November 24, 1993. During the thirteen months the SBLR had this matter under submission, a transmogrification occurred: the August 26, 1991 vote to approve the "new pension agreement" became a vote on a "C.G.S. § 7-474 (b) request" and instantly an approval of the agreement.
This result is wholly at odds with the law and finds no support in the record.
The word "agreement" and the word "request" are, of course, different. They are not synonyms or even distant cousins in CT Page 3438 meaning. No rule of statutory construction is known to the court which makes them otherwise as used in C.G.S. § 7-474 (b). Nor is the court aware of any reason why these words should not be "construed according to the commonly approved usage of the language." C.G.S. § 1-1(a). Neither word has "acquired a peculiar and appropriate meaning in the law" of municipal labor relations. Id. There is no judicial authority that these words have the same meaning.[6] And, it does not appear the SBLR has previously considered these words as synonyms. As will be shown below, the SBLR, with the exception of this case, has recognized the distinction between these words in the context of C.G.S. §7-474 (b).
These words, "agreement" and "request," as used in C.G.S. §7-474 (b), are not as a matter of law one and the same. The SBLR acknowledges that they are not the same. Transcript of Court Proceedings, October 29, 1996, p. 28.
The record shows that on August 26, 1991, the City Council voted on the agreement. The SBLR wanted to transform that City Council vote into a vote on a "C.G.S. § 7-474 (b) request." What to worry! The "agreement" must have meant a "request." So Humpty Dumpty like, the SBLR chose to have "agreement" mean "request."[7]
Not being the same as a matter of law, the SBLR's treating them as one and the same must be based on a factual determination made by the SBLR. Necessarily, the SBLR had to find as a fact that the August 26, 1996 vote of the City Council, although ostensibly a vote "to accept and ratify" the "new pension agreement," was in fact a vote on a "C.G.S. § 7-474 (b) request," i.e., "a request for funds necessary to implement such written agreement and for approval of any provisions of the agreement which are in conflict with any charter, special act, ordinance, rule. . . ." C.G.S. § 7-474 (b).
As is the case with any fact finding by an administrative agency, including a fact finding by the SBLR, the evidentiary record before the agency must support that finding of fact. The SBLR's findings of fact must be supported by "substantial evidence."
The court has carefully reviewed the entire Record of the SBLR's proceedings in this case as returned by it to this court. As will be developed below, there is nothing in the record which CT Page 3439 even intimates the Groton City Council voted on a "C.G.S. §7-474 (b) request" on August 26, 1991.
There is no evidence that any provision of the "new pension agreement" was in conflict "with any [Groton] charter, special act, ordinance, rule or regulation adopted by [Groton] or its agents, such as a personnel board or civil service commission, or any general statute directly regulating the hours of work of policemen or firemen or any general statute providing for the method or manner of covering or removing employees from coverage under the Connecticut municipal employees' retirement system or under the Policemen and Firemen Survivors' Benefit Fund." C.G.S. § 7-474 (b).
The Record does not contain anything which even suggests the City Council was voting to approve any provisions of the agreement "just in case" there were any which conflicted with any law enumerated in C.G.S. § 7-474 (b). That is, there is nothing which indicates the Council "voted in the blind." The court would not attribute such irresponsible conduct to the Council. Again, there is nothing in the Record which would support a finding that the Council knew it was, or was, voting to approve "any provisions of the agreement which [were] in conflict with any" provisions of law as enumerated in § 7-474 (b).
During the court hearing, the court asked:
 The Court: Okay. So you would agree with me that the City Council on August 26th wasn't voting about approval of any conflicting provisions?
Counsel for the SBLR candidly answered: "I would agree with that." Transcript of Court Proceedings, 10/29/96, p. 34-35.
The August 26, 1991 vote of the City Council was not a vote on a request for approval of any provision(s) of the "new pension agreement" which were, or might be, in conflict with any of laws described in C.G.S. § 7-474 (b).
Similarly, the Record contains nothing which would support a finding that the August 26, 1996 Council vote was on a request for funds necessary to implement the "new pension agreement." Perhaps the most significant part of the "new pension agreement" is that which requires each firefighter to increase his or her contribution from 7 1/4% to 7 1/2% of his/her base CT Page 3440 earnings including certain overtime. Certainly, that provision did not necessitate any funds from the City. No requests for funds was needed by virtue of that term.
The "new pension agreement" was to be in effect for five years. It provided that a limited amount of a firefighter's overtime income would be included in the calculation of the firefighter's "final average earnings." Overtime would be included as follows: $1,000 as of July 1, 1991, $1,500 as of July 1, 1993, and $2,000 as of July 1, 1995. This overtime was subject to the new 7 1/2 % contribution rate.
The third substantive provision of the new pension agreement changed the basis for calculating the "final average earnings." The "final average earnings" would be "averaged over the highest three (3) [instead of five (5)] calendar years of employment as a fireman."
It is conceivable that either or both of these two provisions of the "new pension agreement," might require more funds from the City. However, whether these provisions would require additional City funds, or the amount, if any, thereof, can not be determined without having the information needed to do the actuarial valuation, e.g., the number of and age of each fire fighter, each fire fighter's present years of service, years to eligibility for retirement, years to retirement, etc.
This information is not in the record of the SBLR. Thus, the record does not contain the information necessary to determine if either one or both of these two provisions necessitated additional City funding.
More telling of course, is the absence of any showing that the one quarter of one per cent increase in each participant's contribution would not cover the costs, if any, caused by the other two provisions of the "new pension agreement."[8] The record developed before the SBLR is insufficient to make this determination.
The SBLR simply did not have information of record which would enable it to conclude that the "new pension agreement" I required new or additional funds from the City. The record also I indicates the SBLR did not make any express finding that the "new pension agreement," unsubstantiated as such a finding would be, required new or additional funding from the City. Such a finding CT Page 3441 is implicit in the SBLR conclusion that the August 26, 1991 vote to accept and ratify the "new pension agreement" "constituted approval of the `request for funds'" necessary to implement the "new pension agreement."
The "new pension agreement" amended the original pension agreement which was adopted in 1976. Under the terms of the "new pension agreement," all provisions of the original 1976 agreement which were not specifically amended by the "new pension agreement" remained in full force and effect. The 1976 agreement contained a provision calling for a triennial actuarial valuation and an automatic funding by the City for the amounts shown necessary. That automatic funding provision is set forth in full at page 5-6, above. See also Record, Item ___.
Because of this provision of the 1976 pension agreement, there was no need for a request for funds even if the new pension agreement necessitated additional funds from the City.
During the court hearing, the court asked:
 The Court: Was there any evidence before the Board that this agreement, proposed agreement, was going to cost the City anything?
With candor, SBLR counsel answered: "No." Transcript of Court Proceedings, 10/29/96, p. 35.[9]
It is quite clear the SBLR did not make, and could not have made, a substantiated finding that the City Council vote taken on August 26, 1991 was a vote on "a request for funds necessary to implement the [`new pension agreement']."
Thus, the court must conclude that the vote of the City Council taken on August 26, 1991, was not a vote on "C.G.S. §7-474 (b) request."
The SBLR was wrong in holding that the August 26, 1991 vote was a vote pursuant to C.G.S. § 7-474 (b).
The second step of the SBLR's improvisation that the August 26, 1991 approved the "new pension agreement" is equally flawed. The SBLR states: "[t]he statutory scheme contemplates that the legislative body will act on the written agreement between the chief executive officer and the Union. . . . All that was CT Page 3442 still lacking was the approval of the legislative body, and that was finally given on August 26." Decision No. 3181, p. 8.
How the SBLR divined this "contemplation" is not known to the court. The statute does not express it; in fact the statute indicates otherwise. And, SBLR precedents expressly negate the proposition.
Elsewhere in its discussion, the SBLR stated:
 "Although the Town Charter provides that motions do not carry unless a majority of the full Board approves it — i.e., in this case four votes, we conclude that he statute is so explicit as to the nature of the vote required that it takes precedence over the Charter provision." City of Groton, Decision No. 3181, p. 8.
The notion that MERA contemplates or requires municipal legislative approval of a negotiated collective bargaining agreement flies in the face of both early and recent, well-reasoned, sound SBLR precedent on MERA and C.G.S. § 4-474 (b).
In the Matter of Town of Milford (Highway Department)-and- International Brotherhood of Teamsters, Chauffeurs, Warehousemen Helpers of America, Local Union No. 677. SBLR Decision No. 740 (1967) is the earliest case decided by the SBLR with which the present case conflicts. The pivotal issue in that case was the role and authority assigned the municipal legislative body by the second sentence of C.G.S. § 7-474 (b).[10] There, the SBLR held:"[T]he only question properly to be submitted to the town meetinghere was the request for funds; the approval or disapproval of the agreement in any other respect was not within the province of the town meeting." [Underscoring in original] Id, @ 3(a).[11]
The Town of Milford appealed the SBLR decision to the Superior Court in Litchfield County. The court upheld the SBLR. The court stated:
 "The Act (as of 1965) clearly provides what shall be the [legislative body's] role in the process of negotiating and reaching an agreement. This does not include the power to approve or disapprove the contract under the facts here. . . .
"To follow the statute calls for submission to the CT Page 3443 [legislative body] of a request for funds in a specific amount. Relevant to that submission are only those aspects of the agreement (e.g. raises in salary, monetary benefits) which determine that amount. The statute gave the [legislative body] only the function of approving or disapproving a request for funds required to meet the amount called for by the contract, and not the function of approving or disapproving the terms of the contract itself. The only question properly to have been submitted to the [legislative body] the request for funds."
. . .
 "§ 7-474 (b) limit's the [legislative body's] legal function in this case to approving or disapproving a request for funds needed to implement the agreement. . . . ." Town of Milford v. Connecticut State Board of Labor Relations, Superior Court, Litchfield County, No. 19, 343 (July 19, 1967).
Just less than a year after its decision in Town of NewMilford, Decision No. 740 (1967), the SBLR again held, without reference to the Town of New Milford decision, that C.G.S. §7-474 (b) restricts the municipal legislative body's role. City ofNorwich, Decision 790 (1968), p. 4.
 "The fundamental question presented by this case is the function and responsibility of the legislative body of a municipal employer in approving or rejecting a collective agreement. Under section 7-474 the legislative body plays a limited but critical role in the collective bargaining process. The failure of the legislative body to understand its role and to fulfill its responsibility can frustrate the bargaining process and defeat the purposes of the statute.
 "The chief executive of the municipal employer or his designated agent is the bargaining representative, and he is empowered by the statute to sign a binding agreement unless provisions of that agreement conflict with provisions of the City Charter, ordinances or regulations, or unless additional appropriations are necessary to implement the agreement. The legislative body has no role in the bargaining process except where CT Page 3444 one or both of these conditions exist. However, where one or both of these conditions do exist the chief executive must make a request for the funds necessary to implement the agreement and for approval of any provisions of the agreement which are in conflict with any charter, ordinance or regulations of the municipal employer. The legislative body must act to accept or reject that request. If the legislative body rejects, then the matter is returned to the parties for further bargaining. City of Norwich, Decision No. 790 (1968), p. 4.
Similar authority is found in Town of Groton, Decision No. 806 (1968).
 "The statute places upon the chief executive officer or designated representative the power and responsibility to represent the municipal employer in collective bargaining. Under Section 7-474 he is the one who is charged with the responsibility of negotiating with the employee organization with the authority to conclude a collective agreement. No action of the legislative body is required to make that agreement binding except where additional funds are necessary to implement the agreement or provisions of the agreement are in conflict with provisions of the charter, special acts, ordinances, rules or regulations adopted by the municipal employer. Even in that case, the legislative body's function is strictly limited to either approving or rejecting as a whole the request for additional funds and for approval of the conflicting provisions of the agreement. If the legislative council rejects the request, the matter is returned to the chief executive for further bargaining. The drafters of the statute thus deliberately restricted the role of the legislative body and placed primary responsibility upon the chief executive." Town of Groton, Decision No. 806 (1968), pp. 12-13.
In City of Putnam, Decision No. 1231 (1974), the employee organization refused to sign an agreement reached after negotiation because the city attorney had included a provision "that the money items in the agreement `are subject to the approval of the Common Council . . . in accordance with the provisions of Section 7-474 (b) and (c). . . .'" The SBLR stated the disputed provision "was a correct legal proposition." CT Page 3445 "[T]he terms of the agreement which required appropriation of funds [were presented] to the common council." Apparently the council refused to approve the required funds; in addition the council attempted to set the pay rates for individual positions which had been in the agreement.
 "Nothing but the provisions of section 7-474 (b) would justify such submission.
 "The submission was, therefore quite proper, but its sequel is carefully prescribed by the Act. The legislative body `may approve or reject such request as a whole by a majority vote of those present and voting on the matter; but if rejected, the matter shall be returned to the parties for further bargaining.' It is clear that the common council went beyond its carefully circumscribed function when it sought to establish rates to be substituted for those rejected. Moreover the rejection was piecemeal rather than `as a whole.'" City of Putnam, Decision No. 1231 (1974), p. 3.
In 1976, the SBLR again addressed the principle.
 "The Act itself prescribes the way that ultimate political control shall be exercised: after the negotiators have bargained to an agreement it is to submitted to the City's legislative body if a request for funds is necessary to implement the agreement." City of New London, Decision No. 1372 (1976).
There, the SBLR was confused but was half-right. The agreement, under C.G.S. § 7-474 (b) is not to be presented to the legislative body; a request for funds shall be presented to the legislative body if funds are necessary to fund the agreement. More recently, indeed since its decision in the case at bar, with some vigor, the SBLR reiterated its clear view of the proper role of the municipal legislative body. See Town of Trumbull,
Decision No. 3097 (1993).
 "Since its inception, with some subsequent amendments, the Act in § 7-474 has set forth with great care a structure for collective bargaining within municipalities. As we have noted before, in § 7-474 (b) that structure for making valid agreements is specified as the exclusive method for making valid agreements. CT Page 3446 Town of New Milford, Decision No. 740 (1967). . . . Within this statutory structure [Subsections (a), (b) and (c) of § 7-474] certain entities within a municipality — i.e. the chief executive officer, the legislative body, and the Board of Finance, are given discrete responsibilities in the collective bargaining process which may not be exercised in a manner which infringes upon the other entities. Subsection (a) of Section 7-474 specifies that a municipality's chief executive officer negotiates collective bargaining agreements. Thus, this is not a role for the Board of Selectman or the Board of Finance. See also Town of Groton (Police Dept.), Decision No. 806 (1968) (Discussion of role of Chief Executive Officer). Section 7-474 then goes on in subsection (b) to specify that any agreement which is reached shall be put in writing and then the municipal bargaining agent shall submit to the legislative body (unless that is the Town meeting) a request for one of two things: (1) funds to implement the agreement and (2) approval of any part of the agreement which conflicts with charter, special acts and other items specified in the Act. Subsection (b) further provides that "the legislative body may approve or reject such request as a whole by a majority vote . . . (emphasis added)." If the request is rejected, the matter is returned to the parties for further bargaining.
 "These provisions thus set up a very limited role for the legislative body, one that forecloses any involvement of the legislative body in the wisdom or content of individual contract provisions. Our prior decisions, with court affirmation, have made this limited role crystal clear. Town of New Milford,
Decision No. 740 (1967) (aff'd). Town of New Milford v. Connecticut State Board of Labor Relations, Superior Court Litchfield County, Docket No. 19343 (1967). As held in those decisions, under the Act, a legislative body is not authorized to approve the terms of an agreement, but merely to approve or reject the request for funds, or provisions conflicting with charter, special acts, etc. See also City of Norwich, Decision No. 790 (1968). Also, the request for funds must be taken as a whole, not piecemeal. See language of 7-474 (b). See also City of Putnam, Decision No. 1231 CT Page 3447 (1974). Moreover, this limited role is assigned to the legislative body, not the Board of Finance. Town of Trumbull, Decision No. 3097 (1993), pp. 12-14. [Footnote omitted.][12]
For years, including 1993, it has been "crystal clear" from the SBLR's own decisions that "under the Act, a legislative body is not authorized to approve the terms of an agreement, but merely to approve or reject the request for funds, or provisions conflicting with the charter, special acts, etc." Id, 14. The "court affirmation" the SBLR recounted above occurred in the Superior Court decision on the appeal of the SBLR's decision inTown of New Milford, Decision No. 740 (1967). The court stated:
 "The statute gave the [legislative body] only the function of approving or disapproving a request for funds required to meet the amount called for by the contract, and not the function of approving or disapproving the terms of the contract itself. The only question properly to have been submitted to the [legislative body] was the request for funds." Town of Milford v. Connecticut State Board of Labor Relations,
Superior Court, Litchfield County, No. 19,343 (July 19, 1967), p. 6.
Stated another way, under MERA, a municipal legislative body has no role in the collective bargaining process if there is no request for funds or request for approval of such provisions of the negotiators' agreement, if any, which conflict with certain existing laws. Here, there was no "C.G.S. § 7-474 (b) request." The SBLR decision in this case is a gross aberration from "[o]ur prior [SBLR's] decisions, with court affirmation." Id.
The court cannot tell why the limited role of the municipal legislative body in the collective bargaining process which was "crystal clear" to the SBLR in 1993 based on its "prior decisions, with court affirmation," was obscured when the SBLR decided this case in 1991. In the "prior decisions" and in the 1993 Town of Trumbull decision, the SBLR found the municipalities involved had committed prohibited practices. The particular municipality's legislative body had injected itself into the collective bargaining process by trying to approve or disapprove the terms of the agreement reached by the negotiators; the legislative bodies had not confined their role to voting on a "C.G.S. § 7-474 (b) request." as prescribed by MERA. In the case CT Page 3448 at bar, the SBLR lost sight of what had been a "crystal clear" rule of law which would have cleared the City of Groton of the prohibited practice complaint. No good reason has been advanced for this. The "crystal clear" rule should not be deep-sixed just because it gets in the way of finding a municipality committed a prohibited practice!
In the case at bar, the SBLR held that the City Council, pursuant to MERA's § 4-474 (b), approved the entire "new pension agreement" when it voted on August 26, 1991. Clearly, § 4-474 (b) gave the Council no authority to do so. As the SBLR stated in 1993: MERA "forecloses any involvement of the legislative body in the wisdom or content of individual contract provisions."Town of Trumbull, Decision No. 3097 (1993), p. 14. Section 7-474
(b) and the SBLR and court precedents prohibited the City Council from acting on the agreement where there was no request for funds or approval of provisions conflicting with other provisions of law. Under MERA, the City Council had no authority to approve the "new pension agreement."
There is no tension here between the City Charter and the statute. Section 7-474 (b)'s "majority vote of those present and voting" has no application here because there was no request for funds or approval of provisions of the agreement which conflicted with certain laws. Section 7-474 (b) had no proper place in this case.
The SBLR erred in holding that the August 26, 1991 vote of the City Council was a vote under MERA which approved the "new pension agreement."
Section 7-474 (e) reads in part:
 "The procedure for the making of an agreement between the municipal employer and an employee organization provided by said sections [7-467 to 7-477] shall be the exclusive method for making a valid agreement for municipal employees represented by an employee organization, and any provisions in any general statute, charter or special act to the contrary shall not apply to such an agreement." C.G.S. § 7-474 (e).
MERA requires the municipal chief executive officer, or his designated representative, and the employee organization's representative, to negotiate an agreement. If an agreement is CT Page 3449 reached by these negotiators, it becomes binding upon the parties if the agreement does not require municipal funding or the agreement does not conflict with certain laws. In the absence of a need for funding or conflict(s) with certain laws, under MERA, no municipal legislative action is needed or even permitted.
Here the agreement reached by the Mayor's designated negotiator, Davis, and the Fire Fighters' negotiator, Hartman, vis-a-vis MERA, would have become binding without any City Council action because the agreement did not require City funding and did not conflict with existing law. The agreement was submitted to the Council because the negotiators expressly made Council approval a part and a requirement of their agreement. Their including the City Council approval in their agreement may well have been in conflict with, and prohibited by, MERA's §7-474 (e). But it was a part of the negotiators' agreement and in accordance with its requirement, it was submitted to the Council. Thus, the City Charter's "majority of the councilors" provision, not § 7-474 (b)'s "majority of those present and voting, " governed.
Even if the inclusion of the "council approval" requirement was prohibited by MERA's § 7-474 (e), the result is the same. The' usual principles of contract severability apply. The agreement reached by both negotiators contained the provision for council approval; it could not be excised from the agreement leaving the remaining provisions as their agreement without distorting what the negotiators had deemed their agreement.
At oral agreement before the court, counsel for the SBLR had no knowledge of any rule that displaced the ordinary rules regarding contract severability in this case. See Transcript of Court Proceedings, 10/29/1996, p. 43.
In Aetna Casualty Surety Co. v. Murphy, 206 Conn. 409
(1988), the Supreme Court described a principle of law applicable here.
 ". . . the law of contracts supports the principle that contracts should be enforced as written, and that contracting parties are bound by the contractual provisions to which they have given their assent. Among the provisions for which the parties may bargain are clauses that impose conditions liability. `If the occurrence of a condition is required by the agreement CT Page 3450 of the parties, rather than as a matter of law, a rule of strict compliance traditionally applies.' E. Farnsworth, Contracts (1982) § 8.3, p. 544; see Grenier v. Compratt Construction Co., 189 Conn. 144, 148, 454 A.2d 1289 (1983); Brauer v. Freccia, 159 Conn. 289, 293-94, 268 A.2d 645 (1970); Strimiska v. Yates, 158 Conn. 179, 185-86, 257 A.2d 814 (1969)." Aetna Casualty Surety Co. v. Murphy, 206 Conn. 409, 412-413
(1988).
This principle is applicable here. The agreement was the product of extended negotiations. It was by no means a "contract of adhesion." Id @ 416. The negotiators expressly conditioned agreement on City Council approval. Thus, even if such approval conflicted with MERA, it cannot be read out of the agreement of the parties.
The provision for approval by the City Council was a condition upon which the negotiators predicated agreement.
The linchpin of the SBLR's rationale for its decision having been removed [pulled], that reasoning collapses. The conclusion of the SBLR that the City Council by its August 26, 1991 vote approved the "new pension agreement" cannot stand.
The court holds that the City Council did not approve the "new pension agreement" for the Fire Fighters on August 26, 1991.
Having concluded that "a valid and binding pension agreement exists," the SBLR stated:
 "We have previously made it clear that a refusal to implement a valid collective bargaining agreement constitutes a prohibited practice. Plymouth Water Pollution Control Authority, Decision No. 2937 (1991); City of West Haven (Fire Department), Decision No. 886 (1969). Thus, the City committed a prohibited practice by not recognizing and implementing such." City of Groton, Decision No. 3181 (1993), p. 9.
The SBLR does not cite any statute as authority for its holding that Groton "committed a prohibited practice by not recognizing and implementing" the agreement the SBLR found the parties made. CT Page 3451
By statute, it is a prohibited practice for a municipality to —
 "(4) refus[e] to bargain in good faith with an employee organization which has been designated. as the exclusive bargaining representative of an appropriate unit." C.G.S. § 7-470 (a)(4).
Statute defines the duty to bargain collectively.
 "For the purposes of said sections, to bargain collectively is the performance of the mutual obligation of the municipal employer or his designated representatives and the representative of the employees to meet at reasonable times, including meetings appropriately related to the budget-making process, and confer in good faith with respect to wages, hours and other conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation shall not compel either party to agree to a proposal or require the making of a concession." C.G.S. § 7-470 (c).
The "refusal to implement a valid collective bargaining agreement" is not made a prohibited practice by statute.
The SBLR cites two of its own prior decisions as authority that failure to implement a collective bargaining agreement is a prohibited practice. These cases conflict on the statutory origin for that proposition. See Plymouth Water PollutionControl Authority, Decision No. 2937 (1991); City of West Haven(Fire Department), Decision No. 886 (1969). In both of those cases, over the municipality's objection, as is the situation here, the SBLR found that the parties had reached and made a collective bargaining agreement. In each case, again as here, the SBLR held the municipality had committed a prohibited practice by not recognizing and implementing the agreement.
In City of West Haven (Fire Department), the SBLR held:
 "The failure of the City to implement the agreement including its failure to appropriate funds needed for this purpose, constitutes a prohibited practice within CT Page 3452 Section 7-470 (a) of the Act." Id, 6.
In the Plymouth Water Pollution Control Authority case, the SBLR stated: "The failure to implement the agreement constitutes a prohibited practice under Section 7-474 (b) of the Act." Id, p. 3. The SBLR did not cite City of West Haven (Fire Department),
Decision No. 886 (1969) in Plymouth Water Pollution Control Authority.
In these two cases, the SBLR relied on two different statutes, § 7-470 (a) and § 7-474 (b), as the wellspring for its proposition that a refusal to implement a collective bargaining agreement is prohibited practice.
Nothing in § 7-470 (a) makes a failure to implement a collective bargaining agreement a prohibited practice. A refusal to bargain collectively is a prohibited practice. §§ 7-469 and7-470 (a). "Collective bargaining" is defined by statute. See §7-470 (c). The recognition and implementation of an agreement reached by the negotiators is not a duty under the statute(s) defining "collective bargaining" and/or the "duty to bargain collectively."
Section 7-474 (b) provides in part:
 "Failure by the bargaining representative of the municipality to submit such [C.G.S. § 7-474 (b)] request to the legislative body within such fourteen day period shall be considered a prohibited practice committed by the municipal employer." C.G.S. § 7-474 (b).
Section 7-474 (b) does not make a municipality's not recognizing and implementing a collective bargaining agreement a prohibited practice.[13]
Neither § 7-470 (a) nor 7-474 (b) is authority for the SBLR's holdings that a municipality's not recognizing and implementing a collective bargaining agreement is a prohibited practice
And so the court looks askance at the those cases.
The court has examined MERA. There is nothing in it which even suggests that the failure to implement a collective bargaining agreement is a prohibited practice. There is no judicial authority so construing MERA. CT Page 3453
A state administrative agency, including the SBLR, is strictly a creature of statute. It has the authority granted by statute, no more and no less. It does not have the authority to enlarge or augment the authority given it by the General Assembly.
 "`Administrative agencies are tribunals of limited jurisdiction and their jurisdiction is dependent entirely upon the validity of the statutes vesting them with power and they cannot confer jurisdiction upon themselves.' Castro v. Viera, 207 Conn. 420, 428, 541 A.2d 1216 (1988). `An administrative agency can act only within the bounds of authority granted to it by its enabling statute and within constitutional limitations. It is wholly without power to modify, dilute or change in any way the statutory provisions from which it derives its authority. . . .' Goldberg v. Insurance Department, 9 Conn. App. 622, 626, 520 A.2d 1038 (1987). When an administrative agency takes action that exceeds its statutory authority, that action is void. Breen v. Department of Liquor Control, 2 Conn. App. 628, 634, 481 A.2d 755 (1984)." Nelseco Navigation Co. v. Department of Liquor Control, 27 Conn. App. 614, 620 (1992); reversed on other grounds, 226 Conn. 418 (1993).
This principle applies even if the legislature has omitted a provision, whether by design or oversight, and no matter how vital or worthwhile the agency, or even a court, believes the omitted provision would be.
It is noted that the legislature provided that similar conduct in analogous situations is a prohibited practice. A "refus[al] to comply with a grievance settlement, or arbitration settlement, or a valid award or decision of an arbitration panel or arbitrator, by statute, is a prohibited practice" is, by statute, a prohibited practice. C.G.S. § 7-470 (b)(4).
At oral argument, the court asked counsel if the SBLR had the power to proscribe conduct as a prohibited practice in addition to that which the General Assembly had. The following colloquy occurred:
MS. COLLINS:[14] Your Honor 7-470A, bad faith bargaining CT Page 3454 is Subsection 4, and also Subsection C.
THE COURT: Where?
 MS. COLLINS: It's actually there's a copy of it attached to the City's brief, but it's 7-470. The prohibitive practices are listed in Subsection (a), bad faith bargaining or refusing to bargain is in Subsection (a)(4), and then there's also a reference in Subsection C of the statute.
 THE COURT: Well, C only defines what collective bargaining obligation is.
MS COLLINS: Correct, your Honor.
 THE COURT: Take my example: As a result of the collective bargaining process, the City and a union enter into an agreement. Absolutely no question, the City and the union entered into an agreement and the length of the agreement is for five years. And both sides cooked right along for three years, fully abiding by the agreement. And then in the fourth year, the City says, the heck with it, we don't like that agreement anymore.
 Is that a collective bargaining agreement? Excuse me, collective bargaining prohibitive practice?
MS. COLLINS: Among other things.
 THE COURT: If it is, I would like to know where it is in the statute.
MS. COLLINS: If I may respond, your Honor.
THE COURT: Sure.
 MS. COLLINS: You will not find something that specifically says, failure to comply with the contract is a specific prohibitive practice. What you will find is case law, 7-470, either under CT Page 3455 the stated law, or sometimes you look for guidance under the federal act, the National Relations Act.
 THE COURT: Oh, so that what your position is, is that the State Board of Labor Relations can supplement the statutes and make up what are prohibitive practices?
 MS. COLLINS: Within the guidelines that the legislature has created, yes, your Honor.
THE COURT: Okay. Have you got authority for that?
 MR. CELENTANO:[15] If I may, your Honor, I would like to file a supplemental brief on that very issue, if I may, because there's clear authority for that.
THE COURT: Well, what authority, any court cases?
MR. CELENTANO: There's court cases.
 THE COURT: I mean, we've got Plymouth Water where Ms. Collins got away with it,[16] and they can't even agree what statutes are involved.
 MR. CELENTANO: There's federal court decisions and probably U.S. supreme court decisions with regard to that.
Transcript of Court Proceedings, 10/29/1996, pp. 22-24.
The are strong parallels between some provisions of the National Labor Relations Act [NLRA] and MERA. Our Supreme Court has said:
 "Because the Municipal Employee Relations Act (MERA); General Statutes 7-460 through 7-479; and the Connecticut Labor Relations Act; General Statutes 31-103 through 31-111b; are closely patterned after the National Labor Relations Act, the decisions of the United States Supreme Court are `of great assistance and persuasive force' in the interpretation of our own labor relations law. West Hartford Education Assn.,CT Page 3456 Inc. v. DeCourcy, supra, 579." Local 1186 of Council No. 4 v. State Board of Labor Relations, 224 Conn. 666, 670-71 (1993).
The court had not been able to find any court case stating that the SBLR had authority to proscribe and define conduct as a prohibited practice in addition to that conduct which the General Assembly had so defined. The court, therefore, looked forward to receipt of the defendants' briefing on that subject.
The SBLR and the Fire Fighters filed a "joint" eight page post-hearing brief. It does not contain even a sentence on whether the SBLR has authority to define prohibited practices in addition to that conduct so proscribed by the General Assembly. It does not contain any mention of the contention that the National Labor Relations Board had authority under the NLRA to proscribe as an "unfair labor practice" conduct which the Congress had not made an "unfair labor practice." Why the absence of these materials in view of the confident, perhaps strident, assertions made on these subjects at oral argument? See pp. 48-49, above. [Transcript of Court Proceedings, 10/29/1996, p. 24 et seq.]
The court has been unable to find anything supporting the ideas that the either the NLRB or the SBLR has authority under the NLRA and MERA, respectively, to make conduct an "unfair labor practice" or a "prohibited practice" in addition to that conduct so defined by the either Congress or the General Assembly. And, the Court has found two decisions of the Supreme Court of the United States which indicate strongly, and perhaps hold, that the NLRB cannot label conduct as an unfair labor practice and thus prohibit which the Congress itself has not defined as an "unfair labor practice." National Labor Relations Board v. InsuranceAgents' International Union, AFL-CIO, 361 U.S. 477 (1960); andAmerican Ship Building Co. v. National Labor Relations Board380 U.S. 300 (1965).
National Labor Relations Board v. Insurance Agents'International Union, AFL-CIO, involved the Prudential Insurance Company and its agents' union. The parties were negotiating a new agreement to replace one which had expired. The union agents began what today would be called a "job action," a program of "planned, concerted on-the-job activities designed to harass the company." 361 U.S. 480. The union continued to negotiate. Prudential filed an unfair labor practice complaint with the CT Page 3457 NLRB. The NLRB hearing examiner found nothing "to support an inference that the union had not fulfilled its statutory duty" to bargain collectively. 361 U.S. 481. Nevertheless, the NLRB issued a cease and desist order; it was the NLRB's view —
 "that irrespective of the union's good faith in conferring with the employer at the bargaining table for the purpose and with the desire of reaching agreement on contract terms, its tactics during the course of the negotiations constituted per se a violation of § 8(b)(3)." [Footnote omitted.] 361 U.S. 482.
The issue was framed:
 "`The issue here . . . comes down to whether the Board is authorized under the Act to hold that such tactics, which the Act does not specifically forbid but Section 7 does not protect, support a finding of a failure to bargain in good faith as required by Section 8(b) (3).'" [Footnotes omitted.] National Labor Relations Board v. Insurance Agents' International Union, AFL-CIO, 361 U.S. 477, 483 (1960).
The Supreme Court held against the NLRB and its attempt to augment the NLRA and its own authority.
 "We think the Board's resolution of the issues here amounted not to a resolution of interests which the Act had left to it for case-by-case adjudication, but to a movement into a new area of regulation which Congress had not committed to it. Where Congress has in the statute given the Board a question to answer, the courts will give respect to that answer; but they must be sure the question has been asked. We see no indication here that Congress has put it to the Board to define through its processes what economic sanctions might be permitted negotiating parties in an `ideal' or `balanced' state of collective bargaining." National Labor Relations Board v. Insurance Agents' International Union, AFL-CIO, 361 U.S. 477, 499-500
(1960).
The Supreme Court came to a like conclusion five years later when the NLRb had found an employer had committed an unfair labor CT Page 3458 practice. In that case, the employer was
 "primarily engaged in the repairing of ships, a highly seasonal business concentrated in the winter months when the freezing of the Great Lakes renders shipping impossible. What limited business is obtained during the shipping season is frequently such that speed of execution is of the utmost importance to minimize immobilization of the ships." American Ship Building Co. v. National Labor Relations Board, 380 U.S. 300, 302 (1965).
During negotiation of a new labor contract, the company "locked out" its employees to bring pressure on the union to accede to the company's position on the negotiations. The union filed an "unfair labor practice complaint." The NLRB held the employer had violated the NLRA. The question presented to the Supreme Court was
 "whether an employer commits an unfair labor practice under these sections [§§ 8(a)(1) and (3)] of the Act when he temporarily lays off or `locks out' his employees during a labor dispute to bring economic pressure in support of his bargaining position." 380 U.S. 301-302.
The Supreme Court also defined the question as follows:
 "What we are here concerned with is the use of a temporary layoff of employees solely as a means to bring economic pressure to bear in support of the employer's bargaining position, after an impasse has been reached. This is the only issue before us, and all that we decide." [Footnote omitted.] 380 U.S. 308.
The Court then referred to National Labor Relations Board v.Insurance Agents' International Union, AFL-CIO.
 "What we have recently said in a closely related context is equally applicable here:
 `[W]hen the Board moves in this area . . . it is functioning as an arbiter of the sort of economic weapons the parties can use in seeking to gain acceptance of their bargaining demands. It has sought CT Page 3459 to introduce some standard of properly `balanced' bargaining power, or some new distinction of justifiable and unjustifiable, proper and `abusive' economic weapons into . . . the Act. . . . We have expressed our belief that this amounts to the Board's entrance into the substantive aspects of the bargaining process to an extent Congress has not countenanced." Labor Board v. Insurance Agents' International Union, 361 U.S. 477, 497-498." 380 U.S. 317-318.
The Supreme Court then stated:
 "We are unable to find that any fair construction of the provisions relied on by the Board in this case can support its finding of an unfair labor practice. Indeed, the role assumed by the Board in this area is fundamentally inconsistent with the structure of the Act and the function of the sections relied upon. The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress. Accordingly, we hold that an employer violates neither § 8(a)(1) nor § 8(a)(3) when, after a bargaining impasse has been reached, he temporarily shuts down his plant and lays off his employees for the sole purpose of bringing economic pressure to bear in support of his legitimate bargaining position." American Ship Building Co. v. National Labor Relations Board, 380 U.S. 300, 318
(1965).
In view of (1) these authorities interpreting the NLRA; (2) the court's inability to find any legitimate authority holding that either the NLRB or the SBLR have the authority to proscribe conduct as either an unfair labor practice or prohibited practice under the enabling legislation, the NLRA and MERA, respectively; (3) the defendant SBLR's and Fire Fighters' confident representations that such authorities abound and would be brought to the court; and (4) the defendants' total failure to fulfill their representations without even an attempt at explaining their omission from their brief; and (5) the law that an administrative agency has only the authority given it by the enabling statute(s); the court holds that the SBLR did not, and does not, have authority to make the City of Groton's not recognizing and CT Page 3460 implementing the "new pension agreement" a prohibited practice.
The City of Groton did not commit a prohibited practice.
The court holds that the SBLR did not have authority to issue the cease and desist order. It therefore had and has no force or effect.
The City of Groton filed what amounts to a Counterclaim against the Fire Fighter with the defendant SBLR. The SBLR dismissed the Counterclaim. In this appeal to the court, the City also appeals the dismissal of its counterclaim against the Fire Fighters.
The essence of the Counterclaim is that the Fire Fighters' Complaints were so lacking in merit that the Fire Fighters should be responsible for paying the expenses (attorneys fees, etc.) incurred by the City in resisting the Fire Fighters' complaints. The City says: "The allegations contained in the Union's Complaint were `patently frivolous' and did not present `debatable issues.' . . . Said allegations were not based on fact, were not supported by documentation or testimony, and/or misinterpret state statute, the City Charter or the actions of the Mayor and/or the City Council. . . . the Union never withdrew any of its frivolous arguments prior to the close of hearing before the Board." Brief of the Plaintiff, City of Groton, May 25, 1994, pp. 22-23. [105]
The SBLR did find for the Fire Fighters and against the City. As shown above, the SBLR based its decision on its conclusion that the City Council had voted on a "C.G.S. §7-474 (b) request," thereby invoking the lower "majority vote of those present and voting" provision of § 7-474 (b). The Fire Fighters never made such a claim, argument, contention, nor presented evidence to support same, in the SBLR proceedings. The SBLR did find that each of the claims regarding prohibited practices which the Fire Fighters actually had made in the amended complaint had no merit. City of Groton, Decision 3181 (1991), pp. 9-10.
Although the claims made by the Fire Fighters were without merit, the court is unable to conclude that the claims were made in bad faith. And, while the Fire Fighters' complaints setting forth those claims were also without merit, those two complaints afforded the SBLR a launchpad for its flight which landed in CT Page 3461 favor of the Fire Fighters. Under these circumstances, the court cannot sustain the appeal regarding the denial of the Counterclaim.[17]
The appeal of the City of Groton with respect to its counterclaim is denied.
The appeal of the City of Groton with respect to all other matters is sustained.
Parker, J.
C:\FIREFTRS.GRO